[Civ. No. 15741. Second Dist., Div. Three. Nov. 25, 1947.]

FIRST NATIONAL BANK OF STOCKTON et al., Plaintiffs, v. POMONA TILE MANUFACTURING CO. (a Corporation), Respondent; THE BOARD OF TRADE OF SAN FRANCISCO et al., Appellants.

Glikbarg, Wolf & Selig, Loeb & Loeb, A. S. Glikbarg and Herman F. Selvin for Appellants.

Irl D. Brett for Respondent.

SHINN, Acting P. J.—This is an appeal by The Board of Trade of San Francisco and G. W. Brainard, its secretary, both constituting a single party defendant, hereafter called board, in an interpleader action from a judgment awarding a fund in excess of $36,000 to Pomona Tile Manufacturing Company, another defendant, hereafter called Pomona. The issue between them is which has the better claim to the fund.

This controversy between Pomona and the board arose in the following manner. On September 19, 1942, Joaquin Potteries, hereafter called Joaquin, entered into a written prime contract with the United States of America under which Joaquin agreed to supply the U. S. Navy with a speci-

fied amount of crews' mess chinaware for a price slightly in excess of $500,000. By the express terms of this contract Pomona was to supply about 70 per cent of this chinaware. Pursuant to an oral understanding between Pomona and Joaquin, Pomona commenced work on its allocation in the early part of the following December. At this time the heads of Pomona and Joaquin discussed how Pomona was to be paid. Pomona insisted that since it was already having trouble collecting small accounts from Joaquin, some type of arrangement should be worked out whereby Pomona's money would come to it directly from the government, that is without passing through Joaquin's hands. About December 31, 1942, Pomona requested Joaquin by letter that since Pomona might need some financing to enable it to handle its part of the contract, its portion of the billing be assigned directly to its bank, a branch of Bank of America National Trust & Savings Association, hereafter called Bank of America.

Joaquin took this request up with its bank, the First National Bank of Stockton, California, hereafter called Stockton Bank. The Stockton Bank was financing a previous Navy contract of Joaquin, and Joaquin had already promised the Stockton Bank that it would assign to the bank all the money payable to it under its latest Navy contract in return for advances from the bank sufficient to enable it to take care of its 30 per cent of the contract. The Stockton Bank suggested to Joaquin the following arrangement in view of the fact that by virtue of a standard provision in the government contract there could be but one assignment of the money payable thereunder: (1) Joaquin execute to the Stockton Bank its promised assignment for the agreed consideration. (2) Joaquin enter into a subcontract with Pomona (to be dated back to the date of the prime contract) covering Pomona's portion of the prime contract. (3) Pomona execute an assignment of all money payable to it under the subcontract to the Bank of America. (4) Joaquin accept Pomona's assignment. (5) Joaquin instruct the Stockton Bank to make payments under the subcontract to the Bank of America as payments are received on the prime contract for goods manufactured by Pomona.

Joaquin thereupon entered into negotiations with Pomona and the Bank of America to effectuate the arrangement proposed by the Stockton Bank. On January 5, 1943, Joaquin sent to Pomona copies of its proposed subcontract with Po-

mona. Thereafter the heads of the two concerns discussed the matter with the Bank of America. Joaquin and Pomona then entered into the proposed subcontract as specified by the arrangement. Pomona also agreed to Joaquin's assignment of the money payable under the prime contract to the Stockton Bank, and on January 15, 1943, such an assignment was formally executed by Joaquin and a few days later notice was duly given to the appropriate representatives of the obligor, the United States. Presumably thereafter Joaquin borrowed the money it needed to finance its work, under the prime contract, from the Stockton Bank. About this time Joaquin sent to Pomona a copy of Pomona's proposed assignment to the Bank of America of the money payable to it under the subcontract. But Pomona did not execute this assignment forthwith. It first exchanged letters with the Stockton Bank in February for the purpose of establishing that the assignment of the money payable under the prime contract had been made as agreed and that the Stockton Bank as the assignee thereof would recognize Pomona's assignment to the Bank of America, when made, by remitting thereafter all payments made by the government under the prime contract for goods manufactured by Pomona directly to the Bank of America. This being established, on or about March 10, 1943, Pomona executed the assignment to the Bank of America previously sent to it by Joaquin and presumably received from the bank thereafter certain advances needed to take care of its work under the two contracts. The Bank of America thereupon requested by letter to the Stockton Bank that both the Stockton Bank and Joaquin acknowledge receipt of notice of Pomona's assignment to the Bank of America. Joaquin, however, by letter to Pomona objected that the assignment was not agreeable to it because it did not recognize the payments already made to Pomona by Joaquin and did not provide for the withholding for Joaquin of a renegotiation reserve as had been agreed upon between Pomona and Joaquin. The Stockton Bank after conferring with Joaquin advised the Bank of America by letter of Joaquin's objection concerning the renegotiation reserve and of the status of the account between Joaquin and Pomona for the work already done under the contracts by Pomona. This disagreement was cleared up by a letter from Pomona to Joaquin, expressly approved by the Bank of America, recognizing the payments already made under the contracts by Joaquin to Pomona and agreeing that the Stockton Bank

might withhold a specified renegotiation reserve. The Bank of America notified the Stockton Bank by letter of its approval of this solution. The Stockton Bank then took up the solution with Joaquin. Joaquin approved it and through its president orally directed the Stockton Bank to pay Pomona for goods manufactured by Pomona under the contracts through the Bank of America as required by Pomona's assignment. On March 29, 1943, and March 30, 1943, Joaquin and the Stockton Bank respectively endorsed upon Pomona's assignment to the Bank of America acknowledgment of receipt of notice thereof. Thus, the arrangement suggested by the Stockton Bank and outlined in the immediately preceding paragraph was effectuated between the four parties thereto without any modification here material.

This arrangement was performed in the following way. The Stockton Bank kept separate records of the billings attributable to work done by Pomona and of those attributable to work done by Joaquin. On Pomona-manufactured goods the Stockton Bank would receive Pomona invoices from the Bank of America and the corresponding Joaquin invoices covering Pomona's work from Joaquin. It would submit the latter invoices to the Navy for payment. Upon receipt of such payment it would turn over the entire amount by draft to the Bank of America. On the other hand on Joaquin-manufactured goods, it would first apply payments received from the Navy to the payment of Joaquin's indebtedness to it, and hold the balances for Joaquin. Joaquin knew of and acquiesced in this course of conduct by the Stockton Bank. In this manner both banks received payment in full for their respective loans to Pomona and Joaquin.

On September 11, 1943, Joaquin executed a nonstatutory general assignment of all of its property, with an exception not here material, to the board for the benefit of Joaquin's creditors. The board at this time did not know of any claimed assignment to Pomona. On October 4, 1943, the board made written demand upon the Stockton Bank for payment to it of all money payable under the prime contract to Joaquin, the board's assignor. At this time the Stockton Bank held slightly over $11,000 of such money. Subsequently, it received additional amounts and at the time of the trial it had in its possession in excess of $36,000. All of this money had been received from the government in pay-

ment for work done by Pomona under the prime contract. A little over a year later the Stockton Bank initiated this interpleader action to determine the ownership of this fund. About this time the Bank of America reassigned to Pomona by proper endorsement its interest in the money payable under the subcontract. The judgment dismissed the action as to both banks. The sole claimants to this money, therefore, now are Pomona and the board.

Pomona's claim is based upon an alleged assignment to it of the portion of the money payable to Joaquin under the prime contract attributable to the work done by Pomona. This claimed assignment is found in the arrangement. The arrangement between the four parties, which has been both summarized and detailed above, involved two contracts, the prime contract and the subcontract and three assignments, two express and one implied. Both contracts and all the assignments embraced the money payable to Pomona for the work it did for the government. The subcontract represented the 70 per cent of the prime contract which was to be performed by Pomona. The first express assignment transferred all the money payable under the prime contract, including the 70 per cent for Pomona's work, from Joaquin to the Stockton Bank. The second express assignment transferred all the money payable under the subcontract from Pomona to the Bank of America. The implied assignment set over a specific fund, namely the payments by the Navy under the prime contract for work done by Pomona, for the satisfaction of the second express assignment. This implied assignment was accomplished as follows: Joaquin and the Stockton Bank accepted the second express assignment, and Joaquin instructed the Stockton Bank to pay over to the Bank of America, the assignee under the second express assignment, the payments made under the prime contract for work done by Pomona as such payments were received. To effect this, the Stockton Bank divided the total payments into two funds, the first consisting of payments for work done by Joaquin and the second consisting of payments for work done by Pomona. This second fund was paid over to the Bank of America as payments allocable to it came in. Thus a specific and identifiable portion of the money payable under the prime contract, namely, that payable for work done for Pomona, was set aside by implied assignment for the satisfaction of the second express assignment. Pomona's position

would appear to be that the implied assignment operated in its favor as well as that of the named assignee, the Bank of America, because such was the intent of the parties.

The board's claim to this money rests upon the asserted voidability of Pomona's assignment and the alleged priority of its assignment over that of Pomona. More specifically the board contends that there was no assignment to Pomona because the implied assignment did not purport to run in its favor. The board next contends that if there was an assignment to Pomona, as the trial court found, such assignment must be held voidable by the board because made without consideration and without compliance with the formalities required by federal statute for the effective assignment of claims against the United States. Lastly, the board takes the position that it, as a subsequent innocent legal assignee for value and without notice, should prevail over Pomona, at best an earlier equitable assignee.

We shall now consider the applicability and validity of these contentions of Pomona and the board. Upon analysis the legal effect of the arrangement between the four parties appears to have been this. The Stockton Bank, although holding by virtue of the first express assignment the entire present though defeasible interest in the money payable under the prime contract, agreed to and did limit its interest in such money to the first fund by impliedly assigning the second fund in the manner hereinbefore described to the Bank of America. This course of conduct on the part of the Stockton Bank was followed at the direction and with the knowledge and implied consent of Joaquin. The money here in controversy is what remains of the second fund. The controlling issues between Pomona and the board thus become: (1) Did the implied assignment to the Bank of America run in favor of Pomona as well? (2) Is the implied assignment voidable by the board? (3) Which of the two assignments, the implied assignment or the assignment to the board for the benefit of Joaquin's creditors generally, is entitled to priority over the other?

The board contends that the implied assignment did not run in favor of Pomona because no such intention was manifested. The board argues that the only intent shown by the arrangement so far as Pomona was concerned was to make possible the financing of Pomona's portion of the prime contract by setting apart a fund to which the Bank of America could resort as security for its advances to Pomona.

The board concedes that the arrangement effectuated an equitable assignment of the second fund to the Bank of America, Pomona's bank, but denies that this equitable assignment ran to Pomona as well. In this connection it claims that the reassignment from the Bank of America to Pomona was ineffective because the bank's interest in the subject matter of the reassignment terminated prior to the reassignment upon its being repaid its loans by Pomona.

We cannot agree with this contention of the board because it seems to us to rest upon a misconstruction of the intent of the parties in entering into the arrangement and upon a misconception of the relationship between an assignor and assignee for security. What was intended by the arrangement may be fairly presumed from what was effected by it. (Code Civ. Proc., § 1963 (3).) The practical effect of the arrangement was not simply to provide a secure method for the two banks to finance the two contractors by making the government's credit the real security for the bank loans to the contractors. The arrangement also resulted in making the government's credit the real security for the payment of Pomona for the work it did under the two contracts. The banks were not alone in not wishing to rely on Joaquin's credit. Pomona shared their feeling as is evidenced by its request of Joaquin upon beginning work that some type of arrangement be worked out whereby Pomona would receive payment for its work directly from the government. This request the arrangement, in effect, met, because the payments for Pomona's work went directly to the Stockton Bank rather than to Joaquin, the prime contractor, and the Stockton Bank immediately turned them over to Pomona's bank, the Bank of America.

Furthermore, the board's contention that these payments, which constituted what we call the second fund, were not assigned by Joaquin to Pomona but only to Pomona's bank, the Bank of America, is foreclosed by the contrary findings of the trial court as to the intent of the parties. The trial court found that under the arrangement the Stockton Bank took the first express assignment as trustee for not only Joaquin and the Bank of America but also for Pomona, that Pomona's entry into the formal subcontract was conditioned upon Joaquin's assigning the second fund to Pomona, and that this condition was accepted and performed by Joaquin. The trial court made these findings on the basis of

extensive oral and documentary evidence introduced by Pomona for the purpose of showing the terms of the arrangement. A finding of the intent of the parties upon such evidence is a finding on a question of fact. (*Ross* v. *Pacific Mortgage Guaranty Co.,* 16 Cal.App.2d 672, 676 [61 P.2d 368]; *Hacker etc. Co.* v. *Chapman V. Mfg. Co.,* 17 Cal.App. 2d 265, 272 [61 P.2d 944]; *Morrison* v. *Willhoit,* 62 Cal. App.2d 830, 837 [145 P.2d 707].) These findings, as indicated herein, have substantial evidentiary support and are therefore beyond challenge here as being legally erroneous.

■ But we regard them as being factually correct as well because the implied assignment to Pomona's bank, the Bank of America, although for security, was absolute in form and was limited in no manner whatsoever to the amount of the loans made by the bank to Pomona. Hence, the assignment to Pomona's bank was equivalent in practical effect to an assignment to Pomona itself and was apparently so understood by the four parties to the arrangement.

■ Moreover, in legal effect the implied assignment ran to Pomona as well as the Bank of America as a consequence of the relationship obtaining between an assignor and an assignee for security after the obligation secured has been discharged. Accordingly, a manifestation of the intent so to do was unnecessary. It is admitted that the second express assignment, the one from Pomona to the Bank of America, was for security only although absolute in form. The relationship between an assignor and assignee for security is as follows. So long as the obligation secured remains unsatisfied, the assignee holds an entire but defeasible present interest in the subject matter of the assignment. (*Myers* v. *South Feather W. Co.,* 10 Cal. 579, 583; *Kelly* v. *Universal Oil Supply Co.,* 65 Cal.App. 493, 498 [224 P. 261]; *McDevitt* v. *Jones,* 60 Cal.App. 773, 779 [214 P. 661].) ■ There remains, however, in the assignor a future interest in the subject matter, namely, his power of defeasance of the assignee's interest by discharge of the secured obligation. (*Adamson* v. *Paonessa,* 180 Cal. 157, 163 [179 P. 880]; *Webb* v. *Casassa,* 82 Cal.App. 307, 312 [255 P. 541].) Stated otherwise, the assignor's interest in the subject matter of the assignment is what remains after the secured obligation has been satisfied (*Bridge* v. *Connecticut Mut. Life Ins. Co.,* 167 Cal. 774, 777-778 [141 P. 375]), and the assignee's interest is limited to the amount of the secured obligation. (*In re Phillips,* 71 Cal. 285, 289 [12 P. 169].) It follows, therefore, that once the

secured obligation has been discharged, the assignee for security holds the excess as agent or trustee for the assignor. (*Fairbanks* v. *Crump Irr. etc. Co., Inc.*, 108 Cal.App. 197, 217 [291 P. 629, 292 P. 529]; *Ginocchio* v. *Amador C. & M. Co.*, 67 Cal. 493, 496 [8 P. 29].) Thus Pomona, as an assignor for security, at all times held an interest in the subject matter of the second express assignment, the money payable under the subcontract. By means of the implied assignment the second fund was set aside for the satisfaction of this claim. This fund thereby became an incident of the claim. (Cf. *Duncan* v. *Hawn*, 104 Cal. 10, 14 [37 P. 626]; 2 Williston Contracts (rev. ed. 1936) p. 1251.) ▌ Upon payment of the obligation secured by the second express assignment Pomona divested the Bank of America of and invested itself with the entire beneficial interest in the claim. Hence, by virtue of the relationship obtaining between Pomona and the Bank of America under the second express assignment, the implied assignment ran not only in favor of that bank as the designated assignee but also in favor of Pomona, the bank's assignor for security. The reassignment of the claim from the bank to Pomona was superfluous and ineffective because the bank's interest had already revested in Pomona upon payment of the secured advances.

▌ As previously stated the board brands the implied assignment as voidable by it because made without consideration and without the formalities required for an effective assignment of a claim against the United States. The board argues that since at the time of the making of the implied assignment Pomona was already obligated to Joaquin to produce 70 per cent of the prime contract, Joaquin received nothing in return for making the implied assignment. We do not agree. It is true that there are two types of assignment—gratuitous and for value. ▌ An assignment made for a consideration sufficient to support an informal contract is made for value. (Rest. Contracts, § 149.) Section 1605 of the Civil Code defines such consideration as bargained-for benefit or detriment. This consideration does not have to move to the promisor (*Creamery Pack. Mfg. Co.* v. *Bennett*, 48 Cal.App. 706, 709 [192 P. 328]; *Roberts* v. *Aikin*, 13 Cal. App.2d 557, 558 [57 P.2d 519]) or from the promisee. (*Barringer* v. *Warden*, 12 Cal. 311, 315; Rest. Contracts, § 75 (2); Williston, Contracts (rev.ed. 1936) § 114.) One consideration may support the several promises of one end of the

bargain. (*Tennant* v. *Wilde*, 98 Cal.App 437, 442 [277 P. 137]; Rest. Contracts, § 83; Williston, op. cit. § 137A.) Application of these settled rules of law to the making of the implied assignment demonstrates that it was supported by ample consideration. The implied assignment was but a part of the entire bargain made between the four parties, the arrangement. Prior to the arrangement there were simply Joaquin and Pomona and the prime contract. The arrangement introduced the two banks, the subcontract, and the three assignments. The purpose and effect of the arrangement was to provide bank financing for the two contractors and to secure the repayment of the bank loans and the payment of Pomona. The bank credits constituted more than adequate consideration for the arrangement and therefore for its parts, including the implied assignment. While it may be said that the sole effect of the arrangement so far as the Stockton Bank's loans to Joaquin were concerned was merely to limit the security for the loans the bank had already promised, the same cannot be said with respect to the advances of the Bank of America to Pomona. These were obtained solely by means of the arrangement. ■ As the party primarily responsible to the government for Pomona's performance of the portion of the prime contract allocated to it, Joaquin was benefited substantially by the advancement to Pomona by the Bank of America of loans sufficient to enable Pomona to perform properly. (Cf. *Oswald* v. *Schwartz*, 181 Cal. 620, 625 [185 P. 959].) Thus, the Bank of America's loan to Pomona constituted consideration for the implied assignment.

■ Despite Pomona's assertion to the contrary, it must be conceded that the implied assignment was not made with the formalities prescribed by federal statute. (54 Stats. 1029; 31 U.S.C.A. § 203.) But the function of these formalities is merely the protection of the United States from dubious claims. Noncompliance with them is irrelevant once the United States has been discharged from liability. (*Martin* v. *National Surety Co.*, 300 U.S. 588, 594-597 [57 S.Ct. 531, 81 L.Ed. 822]; *McKenzie* v. *Irving Trust Co.*, 323 U.S. 365, 369 [65 S.Ct. 405, 89 L.Ed. 305].) This is the situation here. We conclude that the implied assignment to the Bank of America and Pomona was a valid assignment for value and is not voidable by the board.

The validity of the assignment to the board for the benefit of Joaquin's creditors generally not being challenged, the

final issue of this case still remains—which of the two assignments is entitled to priority over the other. As previously stated the board claims priority for itself as a subsequent innocent legal assignee for value and without notice over Pomona which it characterizes as merely an earlier equitable assignee. We must reject this claim of priority on the part of the board. In the first place, Pomona should prevail because it is entitled to do so under each of the three generally recognized rules of priority between successive assignees of the same claim. In the second place, we are of the opinion that in an equitable action such as interpleader, priority between successive assignments should not now depend upon the thoroughly technical distinction between legal and equitable titles. In the third place, we do not think the board qualifies under the rule of priority it urges, since we do not regard it as a bona fide purchaser. In the fourth place, to accord the board priority on the basis of the rule urged by it would result in placing it, a representative, in a better position than either of the parties such an assignee is usually held to represent— the assignor or the creditors of the assignor. Finally Pomona's equity in the fund is essentially superior to that of the board because Pomona sold its goods to Joaquin in reliance upon payment from this particular fund while the creditors, represented by the board, were content to trust to merely the business responsibility of Joaquin.

 First, the rule of priority between successive assignees of the same thing in action in California is that the assignee who first gives notice to the debtor, or in lieu thereof to the holder of the fund involved, prevails. (*Graham Paper Co.* v. *Pembroke,* 124 Cal. 117, 121 [56 P. 627, 71 Am. St.Rep. 26, 44 L.R.A. 632] ; *Widenmann* v. *Weniger,* 164 Cal. 667, 673 [130 P. 421] ; *Title Ins. etc. Co.* v. *Williamson,* 18 Cal.App. 324, 329 [123 P. 245].) Under this rule Pomona should take the fund because it first notified the Stockton Bank, the holder thereof, of its assignment. The second generally recognized rule of priority between successive assignees is that the time of assignment fixes priority. (See notes, 31 A.L.R. 876; 110 A.L.R. 774.) Under this rule Pomona as the earlier assignee would likewise prevail. The third rule of priority, relating to "rights arising under contracts or for breaches of contract" (Rest. Contracts, §§ 148, 173), summarily presented, is that the subsequent

assignee prevails only if he is a bona fide purchaser and in addition obtains either satisfaction of the obligor's duty or judgment against the obligor or a new contract with the obligor by means of a novation or delivery of a tangible token or writing required by the obligor's contract for its enforcement. Plainly, the board has not met any of the alternative requirements of this rule, and consequently under this rule as well, Pomona should take. Thus, under all of the generally recognized rules of priority between successive assignments of the same thing in action Pomona should prevail.

Secondly, we question whether in an equitable action such as interpleader which is properly governed exclusively by the principles of equity (*Union Mutual Life Ins. Co.* v. *Broderick,* 196 Cal. 497, 502 [238 P. 1034]), a rule of priority based upon the technical distinction between legal and equitable titles should be followed. We grant that the implied assignment to the Bank of America and Pomona is of the character commonly described in our cases as an equitable assignment since its existence is implied from the conduct of the parties rather than established by express words of formal assignment. (See *McIntyre* v. *Hauser,* 131 Cal. 11, 14 [63 P. 69]; *Goldman* v. *Murray,* 164 Cal. 419, 422-424 [129 P. 462]; *Oswald* v. *Schwartz, supra,* 181 Cal. 620, 624-625; *Brady* v. *Ranch Mining Co.,* 7 Cal.App. 182, 184 [94 P. 85]; *Van Orden* v. *Anderson,* 122 Cal.App. 132, 142-143 [9 P.2d 572]; *Baumgarten* v. *California Pac. T. & T. Co.,* 127 Cal.App. 649, 656-657 [16 P.2d 332]; *Oxnard School Dist.* v. *Penn.,* 132 Cal.App. 763, 766-769 [23 P.2d 828].) But the modern view is that the law governing assignment of things in action having originated entirely in equity, priority between such assignments should be determined without regard to any distinction between legal and equitable titles. (*Goodyear Tire & Rubber Co.* v. *Bagg,* 292 Mass. 125 [197 N.E. 481, 483]; *Middle West Roads Co.* v. *Peoples Nat. Bank & Trust Co.,* 210 Ind. 437 [4 N.E.2d 187, 191].) It is to be noted in this connection that the Restatement of Contracts does not mention equitable assignments in its treatment of the subject of assignments although it does discuss several types of assignments which our courts term equitable assignments. (Rest. Contracts. ch. 7.) Furthermore, leading textbooks upon the subject of assignments agree that the interest of any type of assignee is essentially equitable as distinguished from legal. (Williston, *op. cit.* §§ 404, 446A, 447;

Pomeroy, Equity Jurisprudence, (5th ed. 1941) § 693.) Particularly in equity substance should be preferred to form. (Civ. Code, § 3528.) Accordingly, we cannot accept the board's proferred rule of priority for application in the equitable action of interpleader.

 Thirdly, we doubt if the rule of priority urged by the board is applicable to it. By its own terms the rule operates only in favor of bona fide purchasers. It must be borne in mind that the doctrine of bona fide purchaser is purely equitable in nature—an application of the chancellor's conscience. (Pomeroy, *op. cit.* § 738.) The overwhelming weight of authority is that an assignee for the benefit of creditors is not a bona fide purchaser because he is not a purchaser for value. (4 Am.Jur. p. 387; 6 C.J.S. p. 1317; Pomeroy, *op. cit.* § 749b; Rest. Trusts, § 306.) Our research on the point indicates that apparently only two states, Virginia and North Carolina, now definitely hold to the contrary. In fact the point has been so well settled for so long that one must turn generally to the opinions of judges of generations long gone to find thorough expositions of the basis for the prevailing view. It clearly appears from these older decisions such as *Twelves* v. *Williams* (1838), 3 Whart. (Pa.) 485 [31 Am.Dec. 542, 543-545], and *Van Heusen* v. *Radcliff* (1858), 17 N.Y. 580 [72 Am.Dec. 480, 482-484], and from the Restatement of Trusts that the foundation for the prevailing view lies in the concept of present value. Value as used in the phrase ''bona fide purchaser for value'' must be distinguished from value when used in the phrase ''assignment for value.'' (Scott, Trusts, § 297A.) In the latter phrase, as stated earlier in this opinion, value means merely consideration. In the phrase, bona fide purchaser for value, value means present contemporaneous value. (*Fulkerson* v. *Stiles,* 156 Cal. 703, 706 [105 P. 966, 26 L.R.A.N.S. 181]; Rest. Trusts, § 298; Pomeroy, *op. cit.* § 747; cf., notes 80 A.L.R. 395, 109 A.L.R. 163, 124 A.L.R. 1259; *Title Guarantee etc. Co.* v. *Henry,* 208 Cal. 185, 192 [280 P. 959].) Present value excludes by definition past consideration. The consideration for a general assignment for the benefit of creditors is the antecedent debts owed by the assignor to the creditors (*Brainard* v. *Fitzgerald,* 3 Cal.2d 157, 163 [44 P.2d 336]), which plainly is nothing but past consideration. In return for a general assignment for the benefit of creditors, the creditors, the parties benefited thereunder, part with nothing

and place themselves in no worse position than they were prior to the assignment for their benefit. They part with no present value. In this connection it is relevant to note that the assignment to the board did not contain any release of Joaquin's liability to any of its creditors. On the basis of the foregoing we are at a loss to understand how an assignee for the benefit of creditors generally, such as the board, can be regarded as a bona fide purchaser for value. The lone California decision so holding, *Ferger* v. *Allen*, 35 Cal.App. 738, 743 [170 P. 861], ignored this fundamental concept of present value and is otherwise unsound as we shall now demonstrate.

Our fourth ground for rejecting the board's claim of priority is that granting it would place the board, a representative, in a better position than those it represents. In California two types of voluntary assignments for the benefit of creditors generally are recognized—statutory and common-law. (*Jarvis* v. *Webber*, 196 Cal. 86, 96 [236 P. 138].) The basic distinction between the two is that the former complies with the statutory requirements while the latter does not. Under the statutory assignment the assignee is not a purchaser for value and has no greater rights with respect to things in action transferred by the assignment than his assignor had. (Civ. Code, § 3460.) The common-law assignee in this respect stands in no better position than the statutory assignee (*Moore* v. *Schneider*, 196 Cal. 380, 387 [238 P. 81]), for section 3460 merely adopted the common-law rule that the assignee simply stands in the shoes of his assignor. (*First National Bank* v. *Menke*, 128 Cal. 103, 106 [60 P. 675].) In fact, in California the voluntary assignee has been consistently held, in contrast to the assignee in insolvency, who represents the creditors, to represent only the debtor, the assignor. (*Francisco* v. *Aguirre*, 94 Cal. 180, 182 [29 P. 495]; *Ruggles* v. *Cannedy*, 127 Cal. 290, 304 [53 P. 911, 59 P. 827, 46 L.R.A. 371]; *Smith* v. *Kirkpatrick*, 208 Cal. 417, 419-420 [281 P. 616].) The Ferger decision ignored likewise this substantial body of authority. We regard, therefore, the Ferger decision's holding that an assignee for the benefit of creditors generally is a bona fide purchaser to be not only wrong in principle but contrary also to authority. As long ago as 1828, the New York Chancellor rejected as contrary to the settled principles of equity the precise contention of the board here—namely, that because it as vol-

untary assignee for the benefit of creditors acquired the legal estate of its assignor, it could thereby defeat prior equities of which it had no notice at the time of the assignment. (*Matter of Howe*, 1 Paige (N.Y.) 125 [19 Am.Dec. 395, 397].)

But if the board be regarded as the representative of the creditors as the Ferger decision realistically holds, it does not follow that it thereby becomes a purchaser for value because as previously indicated, the creditors themselves are not such. (6 C.J.S. p. 1317; Pomeroy, *op. cit.* § 749b.) Absent, a fraudulent conveyance or an illegal preferential transfer, a creditor, even an attaching creditor, can obtain no better position than his debtor enjoys. (*Burns* v. *Peters*, 5 Cal.2d 619, 625 [55 P.2d 1182].) The collective rights of the liquidator, the assignee for the benefit of creditors, are no greater than the several rights of those he represents. In his representative capacity the assignee must represent either his assignor, the debtor, or his beneficiaries, the creditors. If he be held to represent only his assignor, clearly his position is no higher than that of his assignor. If, on the other hand, he be held to represent the creditors, his position likewise is no better than theirs. Thus, however the assignee for the benefit of creditors be regarded, his stature cannot be raised above those he represents except as to fraudulent conveyances and illegal preferential transfers. He is not a purchaser for value because those he represents are not. (Glenn, Liquidation, (1935), §§ 312, 532.)

Finally, we regard Pomona's equity in the fund as superior to that of the board. We realize that to decide in favor of Pomona is to give Pomona a preference over the other creditors of Joaquin whom the board represents. But preferences are not generally forbidden by our law (Civ. Code, § 3432), since under our system of law an individual may deal with his own property as he sees fit subject only to established limitations of social policy. (*Ferguson* v. *Larson*, 139 Cal.App. 133, 136 [33 P.2d 1061].) In fact, the general rule in both the United States and England appears to be that where no fraud is involved and a fund in the hands of a third person has been set apart for the payment of a particular creditor, whether by way of equitable assignment or otherwise, the preference of that creditor is enforced in the event of the debtor's insolvency. (Note, 32 A.L.R. 950.) This rule rests upon the superior equity

of the preferred creditor in the fund, who rendered his services or otherwise advanced his credit in reliance upon payment from the fund, while the other creditors were content to act upon only the personal responsibility of the debtor. The recognition of the preference gives to each the benefit of his particular bargain. In this case there is no evidence that any of the creditors represented by the board extended credit to Joaquin in reliance upon any of the money received by Joaquin under the prime contract. Pomona created this fund by its work under the two contracts in reliance upon its appropriation to Pomona by means of the implied assignment. Pomona is therefore entitled to it to the exclusion of the other creditors of Joaquin and of their representative, the board. (Cf. *Seymour* v. *Wilson*, 19 N.Y. 417, 420; *Muller* v. *Kling*, 209 N.Y. 239 [103 N.E. 138, 140]; *Greey* v. *Dockendorff*, 231 U.S. 513, 516, [34 S.Ct. 166, 58 L.Ed. 339]; Pomeroy, *op. cit.* § 685.)

The judgment is affirmed.

Wood, J., and Vallée, J. pro tem., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 22, 1948.