[Civ. No. 21570.   Second Dist., Div. Two.   Sept. 4, 1956.]

H. S. MANN CORPORATION (a Corporation), Respondent, v. BRYCE MOODY et al., Defendants; ADVANCE INDUSTRIAL FINANCE COMPANY (a Limited Partnership) et al., Appellants.

Leland & Plattner and N. Stanley Leland for Appellants.

Kopald & Mark and Arthur Smith for Respondent.

ASHBURN, J.—This appeal presents the problem of priority between assignments of certain receivables, plaintiff having purchased same while they were *in futuro* and defendant after they were *in esse*. Judgment went for plaintiff in the sum of $3,501.77. It runs in favor of H. S. Mann Corporation, doing business as California Smelting and Refining Company, and against Advance Industrial Finance Company, a limited partnership, and H. R. Goedert, one of the general partners. Defendants appeal from the judgment.

On September 16, 1952, Bryce Moody was indebted to H. S. Mann in the sum of $8,595.70 for raw materials which he had purchased for his factory. Bryce's father, George Moody, was engaged in manufacturing sprinkler equipment and was buying castings from Bryce. On the last mentioned day Bryce by a writing assigned to Mann an account owing to Bryce by George Moody as it existed on that date "and as it may exist at any time during the term of this agreement." In making such assignment it was Bryce's purpose to use the money due from the account to enable him to purchase his further metal requirements from Mann without direct extension of credit to Bryce. It was the latter's agreement to cause his invoices and billings to bear the notation that same had been transferred, and were payable, to Mann. "Notice of Assignment of Account Receivable" was duly recorded September 18, 1952, when the balance due from George Moody to Bryce was apparently $918.

Bryce Moody and George Moody,[1] were originally defendants, but the action was dismissed as to them. The written contract of September 16, 1952, designates Bryce Moody as "Moody" and H. S. Mann Corp, as "Mann." It contains the following pertinent provisions: "1. Moody hereby assigns to Mann his account receivable from George Moody, doing business as Moody Sprinkler Co., referred to hereinafter as The Account, . . . as that account exists as of this date, and as it may exist at any time during the term of this

---

[1]Herein frequently referred to as Bryce and George for sake of brevity.

agreement. . . . 4. . . . MOODY agrees that he will cause his invoices and billings to THE ACCOUNT to bear the notation that same have been transferred and are payable only to MANN, and that he will cause copies thereof to be sent to MANN at the same time they are sent to THE ACCOUNT. . . . 6. This agreement is, and shall be construed as, a sale by MOODY to MANN of MOODY's account receivable from THE ACCOUNT as it exists this date, and as it will exist in the future.''

Mann continued to sell materials to Bryce who, when castings were sold and delivered to George, would furnish Mann with a memorandum of each delivery. Mann would then send an invoice to George containing a notice that Bryce had assigned to him certain specified invoices owing from George to Bryce. Each of such assigned invoices was paid by George in due course until defendant Advance Industrial Finance Company entered the scene. On February 3, 1953, Bryce sold to Advance invoices totaling $2,677.19, and on February 13, 1953, sold it further invoices aggregating $824.58. On February 3 Bryce owed Mann $6,896.19, and on February 13, $5,778.66. The contract between them was still in existence and the recorded notice of assignment had never been withdrawn. Defendant collected from George Moody $3,501.77 upon the particular invoices sold to it. Bryce later went into bankruptcy.

Counsel debate the applicability and effect of chapter IIIb of title 14, part 4, division 3 of the Civil Code (§§ 3017-3029), which chapter is headed ''Assignment of Accounts Receivable.'' The title of the original act (Stats. 1943, p. 2542) is: ''An act to add a new chapter to Title 14 . . . of the Civil Code to be known as Chapter 3b, relating to the assignment of accounts receivable and providing for the giving of notice thereof.'' Said chapter was enacted as the result of *Corn Exchange Nat. Bank & T. Co.* v. *Klauder*, 318 U.S. 434 [63 S.Ct. 679, 87 L.Ed. 884, 144 A.L.R. 1189] (March, 1943), and in pursuance of a policy of furthering nonnotification financing of receivables. (The history of this statute is discussed in 17 So.Cal.L.Rev. 303; 33 Cal.L.Rev. 40; 38 Cal.L.Rev. 308; 72 A.L.R. 856; and *Durkin* v. *Durkin*, 133 Cal.App.2d 283, 291-292 [284 P.2d 185].) In the Klauder case a creditor's committee of Quaker City Sheet Metal Company took assignments of its accounts receivable, which assignments were recorded on the company's books but no notice was ever given to the debtors whose obligations had been thus transferred.

The company having gone into bankruptcy within four months, the trustee challenged the effectiveness of the assignments as against the bankruptcy estate. Section 60(a) of the Bankruptcy Act as then in existence is set forth in the footnote, so far as here pertinent.[2] The case arose under the law of Pennsylvania which was to the effect that, in case of failure of an assignee of a chose in action to give notice to the debtor, a subsequent good-faith assignee who gives such notice acquires a superior right. The court held that the trustee in bankruptcy had the same rights as a bona fide subsequent purchaser, and said at page 437: ''So long as the transaction is left open to possible intervening rights to such a purchaser, it is vulnerable to the intervening bankruptcy. By thus postponing the effective time of the transfer, the debt, which is effective when actually made, will be made antecedent to the delayed effective date of the transfer and therefore will be made a preferential transfer in law, although in fact made concurrently with the advance of money. In this case the transfers, good between the parties, had never been perfected as against good-faith purchasers by notice to the debtors as the law required, and so the conclusion follows from this reading of the Act that the petitioners lose their security under the preference prohibition of § 60(b).''

Under California law existing prior to chapter IIIb, notice had to be given to the debtor of the fact of assignment of a chose in action in order to effectuate it as one having priority over a subsequent assignment; the later assignee acquired the better right if he bought without knowledge of the existing assignment and gave notice to the debtor before the first assignee did so. (*Graham Paper Co.* v. *Pembroke,* 124 Cal. 117, 120 [56 P. 627, 71 Am.St.Rep. 26, 44 L.R.A. 632] ; *Adamson* v. *Paonessa,* 180 Cal. 157, 163 [179 P. 880] ; *Smitton* v. *McCullough,* 182 Cal. 530, 535 [189 P. 686] ; *First Nat. Bank* v.

---

[2] ''A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, . . . the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. For the purposes of subdivisions a and b of this section, a transfer shall be deemed to have been made at the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, and, if such transfer is not so perfected prior to the filing of the petition in bankruptcy . . . it shall be deemed to have been made immediately before bankruptcy.''

*Pomona Tile Mfg. Co.,* 82 Cal.App.2d 592, 605 [186 P.2d 693] ; *City of Los Angeles* v. *Knapp,* 7 Cal.2d 168, 171 [60 P.2d 127] ; 1 Cal.Jur.2d, § 15, p. 332.)

Various states met the Klauder decision in different ways. (33 Cal.L.Rev. 40, 86.) California, Ohio and Missouri adopted recordation statutes of varying content *(id.* p. 96). Sections 3017-3029, Civil Code (chap. IIIb), enacted on May 26, 1943, constitute the California response to the difficulty.

The transactions at bar occurred in September, 1952, and February, 1953. Between 1951 and September 9, 1953, section 3017 read, in part, as follows: " (1) 'Account' means an open book account, mutual account, or account stated, due or to become due, carried in the regular course of business and not represented by a judgment, note, draft, acceptance, or other instrument for the payment of money; it includes rights under an unperformed contract for work, goods or services which in the regular course will result in an open book account." Section 3018 said, in part: "An assignment of an account is entitled to priority over any subsequent assignment of the same account; provided, that as between two or more assignees who receive written assignments for value without notice, the assignee whose notice of assignment or of intention to assign, is first filed as provided in this chapter is entitled to priority over all other assignees of the same account. Except as to any credit extended by a creditor after the notice provided for in this chapter is filed, an assignment of an account shall be invalid as against any creditor of the assignor without actual notice unless notice of or of intention to make the assignment as provided for in this chapter is filed at the time of or before the execution of the assignment or within five days thereafter." The county recorder is designated as the "filing officer" (§ 3017, subd. (6)), and section 3019 prescribes the necessary contents of the recorded notice.

It appears that Bryce kept in his books no account with George showing the transactions giving rise to receivables. But Exhibit B is a book account kept in George's business which does show those sales and the resulting debits and credits. █ It is settled law that a claimant can establish his claim on an open account by proof of the account as it appears in defendant's books. *(Millet* v. *Bradbury,* 109 Cal. 170, 173 [41 P. 865] ; *Richmond* v. *Frederick,* 116 Cal.App.2d 541, 546-550 [253 P.2d 977] ; *Gardner* v. *Rutherford,* 57 Cal. App.2d 874, 884 [136 P.2d 48] ; *Moss* v. *Underwriters' Report, Inc.,* 12 Cal.2d 266 [83 P.2d 503] ; *Shanklin* v. *Scribner,* 62

Cal.App. 487 [217 P. 130].) The discussion of the law must start with the premise of an existing open account and an assignment of same to plaintiff Mann.

The court, having regard for the statutory phrase ''rights under an unperformed contract for work, goods or services which in the regular course will result in an open book account,'' made finding XI which was intended to affirm the existence of a requirements contract between Bryce and George Moody whereby George was to purchase and Bryce to supply all castings needed by the former in his business. The finding is: ''[T]hat there existed an agreement, express or implied, between the father and son to the effect that the father would purchase all castings necessary for the father's business from the son, so long as the price and quality delivered by the son were competitive; that said agreement between father and son existed prior to September 16, 1952, when the son assigned his account with the father to plaintiff; that plaintiff knew of this agreement between father and son and relied on it in taking said assignment from the son, and that the monies that were to become due to the son, and did in fact become due to the son, after September 16, 1952, from the father, which made up the account assigned to the plaintiff, arose pursuant to and in accordance with the above-described agreement between the father and son.'' But the evidence as a matter of law does not support this finding of an existing contract. George Moody testified: ''Q. Did you ever have any contract or agreement with your son whereby you obligated yourself to purchase any particular amount of merchandise from him? A. No. Q. In other words, he like other customers, would offer you merchandise and if you wanted it you would buy it; is that correct, sir? A. Well, I might make it a little different from that. If I wanted it I would order it. Q. Correct. If you did not want it you did not order it; is that correct? A. That's right. Q. For this merchandise you did not owe him any money, did you, until you ordered the merchandise? A. No.'' Bryce Moody was not asked and hence did not testify on the subject. Mr. Mann testified that George Moody, before Bryce went into the business of making castings, had purchased most of his requirements from Burke's foundry; that when Bryce returned from service in the army George Moody caused to be turned over to Bryce the bulk of the patterns which had been used in making George's castings, and that the bulk of this pattern equipment was moved from Burke's foundry to Bryce's premises; that this may or may

not have been all of the pattern equipment owned by George; that he, Mann, had numerous discussions with George and Bryce concerning the type of their business dealings with one another; "THE WITNESS: . . . Mr. George Moody's conversations with me, said very briefly that if Bryce Moody could produce brass castings at a cost to George Moody that was competitive with prices demanded by other producers of the brass castings; if Bryce Moody were to produce brass castings of satisfactory quality and if Bryce Moody were to maintain delivery schedules which were suitable to the needs of George Moody, he, George Moody, would favor his son, Bryce, to the exclusion of other vendors, but Mr. George Moody made very clear that his son, Bryce, must not place his business at any disadvantage, if he could not produce, to potential sources of supply. I had a very clear understanding of the business relationship between father and son." The foregoing comprises the entire evidence on the subject. It leaves the purported contract without any established price for the goods or any prescribed quantities, with no maximum and no minimum, no commitment by Bryce to supply all the castings that George needed and no promise by George to buy only from Bryce or to buy all his requirements from him. This falls short of an integration. 1 Williston on Contracts, revised edition, section 104A, page 361, says: "A question of interpretation also arises where an offer does not exactly define the quantity of goods. . . . The true interpretation may be, however, that the offer is an open one to be accepted from time to time by submitting orders for specific quantities. The requirement contracts sometimes fall within this category,—a series of contracts being formed as the separate orders are given." A footnote to the text cites numerous authorities to the effect that this does not measure up to an enforcible requirements contract. Volume 46, American Jurisprudence, section 64, page 257: "Where there is no other consideration than the promises of the parties, an agreement for the sale of such quantity as the buyer, at his option, may order or request from the seller is invalid, because the buyer may avoid any liability without any detriment. Where an agreement for the sale of such quantity as the buyer desires, wishes, or wants has been construed to have the same meaning and effect, it has been held invalid for the same reason. Where a seller agrees to sell a definite quantity of a certain article at a fixed price, and the buyer does not agree to purchase any definite quantity, but merely promises to buy only so much

as he may desire to order from time to time, and gives no other consideration, there is insufficient consideration for the seller's promise.'' *Southwest Pipe Line Co.* v. *Empire Natural Gas Co.,* (8th Cir.) 33 F.2d 248, 250 [64 A.L.R. 1229]: ''This court has had occasion in many cases to discuss the question of mutuality in contracts for the future delivery of personal property. It is well established that such contract cannot be enforced, if the will, wish, or want of one of the parties determines absolutely the quantity to be delivered. If that situation exists, there is want of mutuality.'' But the absence of an enforcible contract between Bryce and George does not necessarily end the matter. ██ It calls for a careful analysis and interpretation of the statute, whose dominant purpose was the protection of assignees of receivables against claims of priority of a bankruptcy trustee without the necessity of giving actual notice to the debtor. The Legislature was not interested in redefining assignability of choses, merely in establishing priority over the trustee of such assignments as were recognized as good under existing California law.

██ Monies to be earned under an existing contract have long been held assignable at law; in the absence of an existing contract the question of assignability of potential earnings or other receivables is generally considered one for equity, which supplements and corrects the inadequacies of the common law. Indeed this process has proceeded in this state to the point where the difference between law and equity vanishes for practical purposes so far as concerns the subject in hand. (See *First Nat. Bank* v. *Pomona Tile Mfg. Co., supra,* 82 Cal.App. 2d 592, 606.) ''The California cases relating to contingent results of existing contracts do not refer to such distinction and they state the rule as a general one that equity will uphold assignments, not valid at law, of any future interest, as a rule applying alike to those which are vested, but relate to property to come into existence in the future, and those which rest only in possibility, provided they are fairly made and not against public policy.'' (*Bridge* v. *Kedon,* 163 Cal. 493, 497-498 [126 P. 149, 43 L.R.A.N.S. 404].)

██ It clearly appears that Bryce and George Moody had established a business relationship which actually resulted in George's buying all of his required castings from Bryce, in Bryce's satisfying George as to price, delivery and quality and that the established method of doing business afforded basis for expectation that it would continue indefinitely. The receivables which were to grow out of it had sufficient sub-

stantiality to be recognized as assignable choses, the assignment to become complete when the debt came into being. The case is closely parallel to *H. D. Roosen Co.* v. *Pacific Radio Pub. Co.*, 123 Cal.App. 545, 531 [11 P.2d 873]. It is there said, in part: "While on August 4th, the day of the assignment itself, there was no express agreement that Kriedt was to print the August issue for defendant, yet he had been doing defendant's work for a long time; and Dickow's testimony shows that defendant did not intend to make a change before that issue appeared. In furtherance of the purposes of both parties, an express contract for the printing was made verbally at the time of the acceptance on August 8th, whereby defendant undertook to pay plaintiff $900 out of the compensation to accrue. The fund was unquestionably existent potentially at the time of the acceptance; and in view of the past relations of the parties and the testimony of Dickow as to contemplated continuance of the relationship, the assignment, when made on August 4th, had for its support not merely a supposititious expectancy, but a potentiality sufficient to validate an equitable transfer. (*Walker* v. *Rich*, 79 Cal.App. 139, 144 [249 P. 56].)"

Is the assignment of such a potential chose protected by the recording statute, chapter IIIb? ■ Though subdivision (1) of section 3017 (above quoted), when read without reference to the context, seems to include only receivables, reflected in a book account, which are presently in existence and payable immediately or at some later date, plus such potential receivables as may grow out of performance of a presently existing contract, other provisions of the statute point to the conclusion that the phrase "due or to become due" used in connection with the words "open book account" includes future items of the account which enter into it as a result of later transactions in the course of dealings between the parties to the account. For instance, subdivision (3) of section 3017 defines creditor in such manner as to include one having a contingent claim. Under section 3018 he has priority over the assignee of any book account unless notice is recorded as required. Section 3019, which prescribes the requisites of the notice of assignment, says in subdivision 2 that the notice shall not be effective unless the "assignment, if it assigns *accounts to arise in the future,* gives the general nature of the business out of which such accounts *are to arise* and the address where such business *is or will be carried on.*" (Emphasis added.) This recognizes a right to assign "accounts to arise in the future," not merely future items of an existing account. And the

notice must give the "general nature of the business out of which such accounts are to arise and the address where such business is or will be carried on." This refers to accounts arising from future businesses, as well as future accounts arising out of going businesses. Subdivision 2(a) of section 3019 calls for: "A statement that the assignor intends to assign or has assigned an account or accounts *then existing* or *thereafter arising* to the assignee." (Emphasis added.) In the event the assignor intends to assign or has assigned specified accounts, the notice must set forth the names and addresses of the persons owing the same. As previously noted, the chapter is headed "Assignment of Accounts Receivable" and section 3020 requires the recorder to keep an index entitled "Index of Notices of Assignment of Accounts Receivable."

The guiding star of statutory construction is the intention of the Legislature. To the end that it be correctly ascertained the statute is to be read in the light of its historical background and evident objective. (*Stafford* v. *Realty Bond Service Corp.*, 39 Cal.2d 797, 805 [249 P.2d 241]; 23 Cal.Jur. § 148, p. 773); "the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation." (*Richfield Oil Corp.* v. *Crawford*, 39 Cal.2d 729, 738 [249 P.2d 600].) All parts of the law are to be harmonized. "Where possible, all parts of a statute should be read together and construed to achieve harmony between seemingly conflicting provisions rather than holding that there is an irreconcilable inconsistency." (*Wemyss* v. *Superior Court*, 38 Cal.2d 616, 621 [241 P.2d 525].) And if departure from the literal meaning of the text be necessary to effectuate the legislative intention, that should be done. "A statute must be so construed as to make sense; to make every clause and phrase effective in deriving the legislative intent; and when the true purpose of the statute has been determined, it must be liberally construed in order to effectuate the purpose. The manifest reason and purpose of an act must not be sacrificed to a literal interpretation of its verbiage. When the legislative intent has been ascertained, it must be enforced as intended notwithstanding the derived meaning may be inconsistent with the strict letter of the statute as enacted." (*People* v. *Villegas*, 110 Cal.App. 2d 354, 357-358 [242 P.2d 657].) In the light of these principles no difficulty is experienced in reaching the conclusion that this statute was not intended to change the law of assignability of potential receivables; that its primary pur-

pose was to give priority to the first assignee of any such receivables as are recognized as assignable; that section 3017, properly construed, embraces present and future items of existing and future book accounts; that the word "contract" connotes future agreements as well as those existing at the time of the assignment which is to be protected by the recordation of notice.[3]

The receivables here involved were covered by the assignment to plaintiff and they came into being and hence were fully assigned to him before the covering invoices were sold to defendant on February 3 and February 13, 1953. Notice of assignment having been recorded it was not necessary for Mann to give the debtor, George Moody, notice of his blanket assignment; it was perfected and acquired statutory priority over the later assignments to defendant.

Finding XI is erroneous, but other findings fully support the judgment, which is correct. Finding XI is stricken. The judgment is affirmed.

Moore, P. J., and Fox, J., concurred.

---

[3]Section 3017, subdivision (1), was amended in 1953 to read as follows: " 'Account' means a debt, due or to become due, arising out of the sale, storage, transportation, care, repair, processing, manufacture or other improvement of tangible personal property, or arising out of a contract therefor, or arising out of the rendition of personal services which in the regular course of business will result in an open book account; . . ." Its terms are sufficiently obscure to prevent the amendment from throwing much helpful light upon the present problem, either by way of indicating a legislative intent to change the law or, on the other hand, merely to interpret the previous form of the section.