[Civ. No. 11309.   Second Appellate District, Division One.—September 22, 1937.]

R. B. CLEAVELAND, Respondent, v. INTER–CITY PARCEL SERVICE, INC. (a Corporation), et al., Appellants.

Hugh Gordon, Raymond Tremaine and Franklin L. Knox, Jr., for Appellants.

Louis T. Fletcher for Respondent.

DORAN, J.—This is an appeal from a judgment in an action on a book account.  The facts are as follows: In 1925 and prior thereto, defendant S. B. Cowan and the four other individual defendants were engaged in the business of haul-. ing packages and freight from Los Angeles to points. elsewhere in California.  Each was operating under authority of the Railroad Commission of the State of California and according to the laws applicable to common carriers of freight

by automobile truck. Each had a separate route, operated individually, and there was no cooperative agreement among them.

In 1925, the United Parcel Service of Los Angeles, Inc., a corporation, secured operative rights from the railroad commission and became active in the distribution of package freight throughout the entire area adjacent to Los Angeles, including all of the points served by the individual defendants above mentioned. In order to meet this competition said individual defendants initiated the scheme of forming a corporation, namely, the defendant Inter-City Parcel Service, Inc., to enable them to offer the shipping public a complete service for package distribution throughout the territory adjacent to Los Angeles, at the same tariff rates offered by the United Parcel Service; accordingly, the defendant corporation was formed in 1925, and its stock was divided equally among said defendants. Contracts were entered into between the corporation and its individual directors, the defendants herein, and also with eighteen or twenty others, operating trucking lines, who were not stockholders but who desired to participate in the same arrangement to handle freight through the Inter-City. Among other things, the Inter-City acted as the unified pick-up terminal agency in Los Angeles for all of the carriers party to the arrangement; it collected the amounts due from the shipper to the carrier; kept books of account and rendered settlements with its contracting carriers at regular intervals; it also collected packages from the retail stores and other shippers in Los Angeles, brought them to the terminal of the Inter-City, and assembled and sorted them for the convenience of the respective carriers. Inter-City also owned a number of trucks which were rented, by the company, to those carriers with whom it had the above-described contractual relations. For this service said carriers were charged a certain amount per package by Inter-City, which was termed a "depot" or "terminal" charge.

The income of the Inter-City was reduced substantially by reason of an order of the railroad commission, issued in April, 1927, which prohibited the company thereafter from renting its trucks. In order to meet the reduction of its income as a result of this curtailment, the terminal charge to the carriers was increased. The board of directors of Inter-City, which consisted of the five stockholders above men-

tioned, directed defendant Cowan to interview all of the contracting carriers and to arrange with them to continue their relations with Inter-City under the new increased depot or terminal charge. The Pasadena Express and Freight Service, owned and operated by Mrs. Birdie M. Macy, was one of the carriers operating in conjunction with the Inter-City, as above described. Excerpts from defendant Cowan's testimony, with respect to his conversation with Mrs. Macy on the subject of the increased terminal charge, are as follows:

"Q. (By the Court): Did you testify that when you went back to the Macys that they refused to submit to a higher terminal charge than five cents?

"A. They did, yes. . . . They agreed to leave the money there temporarily, just sort of helping along, at the same time they had the money, it was still due them; they knew we didn't have the money right then, and I told them they would have to agree to some assessment or something, some other method for the Inter-City to carry on, and that was the arrangement.

"Q. (By Mr. Tremaine): Well, you said it was the assumption. It did not have any particular contingency that they were to be paid?

"A. Well, they was to be paid. They wouldn't agree to accept it altogether. . . . And it was reserved as to whether we got the money or not. They were willing to help us along temporarily.

"Q. And when the Inter-City did get the money they would make the payments; is that it?

"A. No, when the Pasadena Express had to have it, why they would come and get it.

"Q. When was it you had this oral conversation with the Macys which you have just been telling his Honor about?

"A. Well, in the spring or summer of 1927. We didn't pay anybody for a number of months.

. . . . . . . . . .

"Q. (By Mr. Gordon): Mr. Cowan, when you talked to the Macys about this terminal charge some time in 1927, did you talk to both Mr. and Mrs. Macy?

"A. Yes.

"Q. Who did you talk to first?

"A. Mr. Macy. . . . On Alameda Street, in a restaurant.

"Q. All right, what was said between you and Mr. Macy at that time?

"A. The substance of it was that we couldn't give him all of the money. If I remember rightly, he said—he said we owed him money and wanted to know when he was going to get some and I told him the action that was taken by the Board of the Inter-City. . . . I told him the directors wanted to have the little carriers help finance the Inter-City and figured they should be—that they should do it. . . . I told him that the Inter-City wanted all the other carriers, other than the stockholders, to help finance the Inter-City.

"Q. Did you tell him they wanted to get more terminal charge in sufficient amount to pay the overhead?

"A. No. . . . That we would only charge him, including the other carriers, the difference between the ten cents a package and what his tariff rate was. . . . he said, 'How do you expect me to pay money that I owe?' . . . I think that he left then, and then I met Mrs. Macy and him both, if I remember correctly, over in their office. In Los Angeles. . . . About three or four days after this first day. . . . I came and asked them whether they figured they could leave that money in there, that I was to report back to the Inter-City directors and give them their answer. They said to the effect that they might help us along temporarily, but couldn't do it forever and that if I wanted my money or they wanted their money they would have to come over and collect."

Excerpts from Mrs. Birdie M. Macy's testimony on the same subject, are as follows:

"Q. . . . did you have any discussion with Mr. Cowan or with any member of the Inter-City with reference to altering or changing the terminal charges?

"A. Mr. Cowan asked us about getting more money, . . . as to the time I have no idea, but I know it was about the date Mr. Cowan said, and he said they were losing business and would have to have more money for operating expenses and he wanted to know if we would agree to a higher terminal charge. . . . He talked to me in my office at Fifth and Alameda. . . . I believe Mr. Macy was present at the time but I am not sure.

. . . . . . . . . . . . .

"Q. Do you know whether it was about the time that the railroad commission rendered its decision with reference to the leasing of the cars?

"A. Yes, I know it was along near that time.

"Q. Just state the conversation, go right ahead. What you said and what Mr. Cowan said.

"A. Well, I told him that I did not believe I could pay a higher terminal rate and that our obligations did not justify our taking a cut, but I would be willing to let the money remain in the company to help them until such time as we needed it, and that is all, that we would accept ten cents a package and pay a five cent terminal charge.

"Q. Right there, did you have any other conversation with Mr. Cowan about that same matter except right around that time?

"A. I don't recall. I talked it over a number of times there with him, just in a general way; when I needed money and came to him for money, the subject would be brought up but I don't recall just what it was about.

"Q. Well, was that the only conversation you had concerning the subject of whether or not you would consent to accept something different than a five cent rate?

"A. Yes."

The Pasadena Express continued to operate in conjunction with Inter-City throughout the years 1927 and 1928 and the first two months of 1929, during which period the business of each was conducted as before. In February, 1929, Inter-City sold out to United Parcel. It is for the period from January 2, 1927, to March 1, 1929, that R. B. Cleaveland, plaintiff herein (as assignee of Mrs. Macy, owner of the Pasadena Express), seeks to recover the difference between the new terminal charge and the old terminal charge. The action herein was filed October 4, 1930, against the Inter-City corporation and also against the five individually named defendants on the respective liability of each as a stockholder of Inter-City. The trial was not commenced until January 22, 1936. The complaint, which was originally in four counts, at the conclusion of the trial was amended to "conform to proof" and alleges but one cause of action: namely, an action "upon a book account consisting of more than one entry",—obviously an effort to seek refuge under the provisions of section 337, subdivision 2, of the Code of Civil Procedure, and to avoid the operation of section 339, subdivision 1, of the Code of Civil Procedure. The former section fixes the period of limitation prescribed for the commencement of actions at four years, the latter section at two years.

It is unnecessary to devote attention to the several findings which are wholly beside the limited issues that may be raised in the cause of action relied upon: namely, an action upon a book account. It is sufficient for the purposes of the opinion herein to observe that the court found, in substance, that defendant Inter-City Parcel Service, Inc., had become indebted to Mrs. Birdie M. Macy upon a book account as of March 1, 1929. Judgment was rendered against the defendant stockholders upon stockholders' liability. From this judgment defendants appeal, with the exception of defendant S. B. Cowan, who acknowledged a substantial interest with plaintiff in the action.

The contention of appellants that the action is barred by the two-year period of limitation must be sustained.

For proof of the alleged cause of action plaintiff depended chiefly, if not altogether, upon the books of the defendant corporation, as well as upon the testimony of Mrs. Macy and defendant S. B. Cowan. The books of the Inter-City corporation, upon which, as above stated, plaintiff seeks to establish the cause of action, are destitute of any evidence, direct or indirect, that tends in the slightest degree to support plaintiff's action on a book account. To the contrary, the books establish the fact that plaintiff is entitled to nothing. After the Inter-City established its increased terminal charge and after the conversation between defendant Cowan and Mrs. Macy, hereinbefore detailed, all of the entries in the books of the Inter-City are based upon the increased terminal charge. Relying altogether upon the books of the Inter-City, plaintiff, as heretofore stated, seeks to recover the difference between the new terminal charge and the old terminal charge. The right to recover this amount, however, depends altogether upon proof of a fact wholly independent of the books of defendant corporation: namely, an oral agreement between the Inter-City corporation and Mrs. Macy, as revealed by evidence of the conversations between Mr. Cowan and Mrs. Macy, hereinbefore outlined. It should be noted here that the other individually named defendants deny the existence of this agreement and contend that the increased terminal charge was collected without qualification. It should also be noted that during all of the period of time in which the new terminal charge was collected, the payments due, and the regular settlements between Inter-City and Mrs. Macy, were calculated on the basis of the increased terminal charge as

shown by the books of the Inter-City corporation. It is evident, therefore, that such a situation gives rise to no cause of action on a book account. If plaintiff has any cause of action at all, it is only a cause of action based upon the oral agreement above referred to which, in effect, was but a loan by Mrs. Macy to the Inter-City corporation. Neither the item of the loan, nor evidence of the oral· agreement capable of identification as such, appears in the book account either literally or by implication. Plaintiff cannot thus extend the period of limitation by purporting to rely upon a book account, and then, by a process of calculation based thereon, seek to establish an amount due under the terms of an oral agreement that bears no relation to the books, and when the enforcement of said oral agreement under the law is barred by the statute of limitations. As has been hitherto declared, "The distinction, as a matter of pleading, between a book account and an ordinary contract debt not founded on a writing is only important when . . . the statute of limitations is involved and where the question arises whether suit may be commenced within four years, or must be begun within two years after the cause of action has accrued." (*Hansen* v. *Burford,* 212 Cal. 100, at 107 [297 Pac. 908], citing *Wright* v. *Loaiza,* 177 Cal. 605 [171 Pac. 311, 312].) It has been held that recovery cannot be had for items not contained in a book account. (*Egan* v. *Bishop,* 8 Cal. App. (2d) 119, at 126 [47 Pac. (2d) 500].) In the case of *Wright* v. *Loaiza, supra,* the court in discussing section 337, subdivision 2, and section 339, subdivision 1, Code of Civil Procedure, declared: "It may fairly be assumed that the idea underlying the enactment of both subdivisions . . . was that a longer period of limitation might well be allowed where the existence of the claim sued upon was supported by some kind of written evidence. Where, on the other hand, the establishment of the contract rests on oral testimony only, the law requires the action to be brought before the lapse of time may prevent the production of witnesses, or impair their memories. If this view be correct, the action against Dolores must be regarded as one upon an oral contract, and not one upon a book account. There is no account or other writing which in any way indicates her liability. To connect her with the transactions at all, resort must be had to parol testimony."

In the recent case of *Lee* v. *DeForest, ante,* p. 351 [71 Pac. (2d) 285, 290], the nature of an action on a book

account was considered, which case, as well as the authorities therein cited with reference to the subject, are applicable to the case at bar. Therein the court declared, "We think that plaintiff's attempt to recover by alleging an open book account when his right of action is based upon the terms of an express contract, ought not to be allowed. It may be noted, in this connection, that the second cause of action was not included in plaintiff's first complaint, but was added by amendment after defendant had set up the defense of the statute of limitations. . . . It also has been held that the provisions of an express contract, and not the entries in an account kept by plaintiff, control the running of the statute. In *Connor Livestock Co.* v. *Fisher*, 32 Ariz. 80 [255 Pac. 996, 57 A. L. R. 196], the plaintiff, who had sued to recover unpaid rent under three oral leases, sought to avoid the effect of the statute of limitations which had been set up by the defendant by including his claim for rent in an 'open account' for money theretofore advanced. The Arizona Civil Code provided that 'actions upon stated or open accounts other than such mutual and current accounts as concern the trade of merchandise between merchant and merchant' shall be barred within three years after the incurrence of the last item of indebtedness therein entered. It was there said, in part: 'An express contract, which defines the duties and liabilities of the parties, whether it be oral or written, is not, as a rule, an open account. . . .' In the case of *Stewart* v. *Claudius*, 19 Cal. App. (2d) 349 [65 Pac. (2d) 933], it was held that in an action to recover instalments due under a written contract, 'the provisions of the contract are controlling as to the running of the statute; and even though the plaintiff keeps a memorandum book in which he charges the accounts accruing under the contract and credits therein the several payments made, the entries in the book account do not fix a new date for the running of the statute.' And in *People* v. *California Safe Deposit Co.* (*People* v. *Magee*), 41 Cal. App. 727 [183 Pac. 289], in holding that a right of action for the payment of money in instalments pursuant to the terms of a contract was barred, the court declared: 'Appellant further contends that his cause of action is based upon a book account, in which the last entry was made on July 7, 1917, and, therefore, his cause of action is not barred. The alleged book account was a memorandum kept by appellant, in which he charged the amounts accruing

under the contract and credited the several payments made, including that collected by him as the result of the judgment in the former suit above referred to. Appellant's alleged cause of action is based upon his contract and not upon this account. The writing is a mere memorandum of debts accruing from an entirely independent source. . . . ' "

In the case at bar there is no account, or other writing, which in any way indicates the liability of defendants. To attach any liability at all, resort, as in the Wright case, *supra,* must be had to parol testimony. The finding, therefore, that the Inter-City Parcel Service, Inc., had become indebted to Mrs. Birdie M. Macy upon a book account is wholly unsupported by the evidence. To the contrary, the evidence indicates but one cause of action, namely, an action upon an express oral agreement, to which action those defendants who properly pleaded the bar of the statute of limitations were entitled to judgment.

For the foregoing reasons the judgment, as to the appellants, is reversed.

Houser, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 20, 1937, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 18, 1937.