[Civ. No. 16246.   First Dist., Div. One.   May 26, 1955.]

MABEL DURKIN, Plaintiff, v. THOMAS J. DURKIN et al.,
Defendants; STATE OF CALIFORNIA, Appellant;
ROLLEN F. CAMPBELL et al., Respondents.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman and Eugene B. Jacobs, Deputy Attorneys General, for Appellant.

Burress Karmel, Cosgrove, Molinari & Tinney, Robert A. Dobbins, Cosgriff, Carr, McClellan & Ingersoll and Luther M. Carr for Respondents.

WOOD (Fred B.), J.—This action involves the relative priorities of certain creditors of an insolvent automobile dealer; particularly, their relative liens upon two bank·accounts of his, a "Dealer's Reserve" and a "Special Holdback Account." The bank interpleaded and paid the moneys in both accounts into court.

The trial court found their priorities as follows: *First,* Robert Gregory, to the extent of $2,250 of the moneys derived from the "Dealer's Reserve Account," by voluntary assignment of the debtor; *Second,* Rollen F. Campbell, in the amount of $1,504.30 and costs, by attachment followed by judgment and levy of execution upon the moneys of both accounts; *Third,* Peter Milan and Lew Irvine, in the amount of $278.63 plus costs and interest, by attachment followed by judgment and levy of execution upon the moneys of both accounts; *Fourth,* the state, a lien upon the moneys of both accounts in the amount of $2,470.07, plus interest and costs, for unpaid sales and use taxes, predicated upon warrants issued and served in 1951-1953 under authority of section 6776 of the Revenue and Taxation Code. The assignment to Gregory was made and the liens of the others were acquired during the insolvency of the debtor.

The state has appealed. It claims (1) the taxes should be satisfied ahead of other creditors' claims in view of the preferences accorded by section 6756, Revenue and Taxation Code; (2) Gregory's assignment was ineffective as against the tax liens for the additional reason that notice of assignment was not filed as required by sections 3017-3029, Civil Code; (3) any liens of Milan and Irvine expired (pursuant to

Code Civ. Proc., § 688) one year after issuance of their first writ of execution, subordinating their claim to the lien created by the issuance, meanwhile, of warrants issued by the state.

■ (1) *The state's contention that the taxes should be satisfied ahead of these other creditors* is predicated upon its interpretation of section 6756[1] of the Revenue and Taxation Code. The state asserts that the provision that the "amounts required to be paid" as sales or use taxes "shall be satisfied first" when the debtor is insolvent means what it literally says: The amounts of these taxes (whether perfected into liens or not) must be satisfied ahead of the claims of all other creditors (whether general creditors, lienholders, or assignees) save only the two types of claims expressly excepted at the end of the section (prior recorded liens and preferred labor claims).

However much we might be persuaded by the state's analysis of the text and the legislative history of section 6756 if this were a matter of first impression, it happens that the question has been answered adversely to the state's contention in two District Court of Appeal decisions which the Supreme Court refused to disturb, denying as it did a petition for a hearing in each case. We refer to *People* v. *Biscailuz* (2d Dist., Div. 3, 1950), 95 Cal.App.2d 635, 640-643 [213 P.2d 753], and *People* v. *Biscailuz* (2d Dist., Div. 2, 1951), 107 Cal.App.2d 71, 73 [236 P.2d 591], interpreting similar, virtually identical, provisions of section 46 of the Unemployment Insurance Act, now sections 1701 and 1702 of the Unemployment Insurance Code. Under these circumstances we are not inclined to undertake a reexamination of the question (see *Masonic Mines Assn.* v. *Superior Court,* 136 Cal.App. 298, 300 [28 P.2d 691] ; *Clover*

---

[1]"6756. The amounts required to be paid by any person under this part [sales and use taxes] together with interest and penalties shall be satisfied first in any of the following cases:

"(a) Whenever the person is insolvent. ·

"(b) Whenever the person makes a voluntary assignment of his assets.

"(c) Whenever the estate of the person in the hands of executors, administrators, or heirs is insufficient to pay all the debts due from the deceased.

"(d) Whenever the estate and effects of an absconding, concealed, or absent person required to pay any amount under this part are levied upon by process of law.

"This section does not give the State a preference over any recorded lien which attached prior to the date when the amounts required to be paid became a lien.

"The preference given to the State by this section shall be subordinate to the preferences given to claims for personal services by Sections 1204 and 1206 of the Code of Civil Procedure."

v. *Jackson*, 81 Cal.App. 55, 59 [253 P. 187] ; *Bridges* v. *Fisk*, 53 Cal.App. 117, 122 [200 P. 71] ; *People* v. *Whitaker*, 68 Cal. App. 7, 11 [228 P. 376] ; 13 Cal.Jur.2d 685, § 145. *Contra, People* v. *Brunwin*, 2 Cal.App.2d 287, 294 [37 P.2d 1072]), especially in view of the fact that the interpretation made in the Biscailuz cases does no violence to the language of the statute, indeed seems no less reasonable an interpretation of its provisions than the view here urged by the state.

That interpretation is best expressed in the words used by the court in the first Biscailuz case: ''The priority conferred by section 46(a) would appear to be intended to apply in cases of insolvency where the state would otherwise be required to share upon an equal footing with general creditors of the employer.'' (95 Cal.App.2d 642.)   That is the fair intendment of the words ''amounts required to be paid by any person under this part . . . shall be satisfied first . . . whenever the person is insolvent.''   It gives the state, when it has failed to obtain a lien, first call over other creditors who likewise do not have liens of any kind.   It leaves our lien laws unimpaired and undisturbed in their operation; indeed, it should require clear and unmistakable language to evince an intent to override those laws.   It comports, also, with the common law concept of the sovereign's right of priority in the case of an insolvent debtor.[2]   Also, as pointed out by the court in that case, such an interpretation did not leave the state hampered or curtailed as to remedies.   It had various procedures available, some quite expeditious, for exacting security or obtaining and perfecting liens.   The same observation applies in our case. (See Rev. & Tax. Code, §§ 6701, 6702, 6711-6715, 6736-6739, 6757-6759, 6776-6778, and 6796-6799.)

Yet, the state urges us to disregard the Biscailuz decision as of no value: ''The failure of the court . . . to discuss or give any effect to the last two paragraphs of the priority section [relating to prior recorded liens and preferred labor claims] deprives the opinion of value as a precedent . . .''

---

[2]The state in its closing brief, p. 4, describes the sovereign's priority as follows: ''At common law the sovereign had a priority of payment out of the assets of an insolvent debtor as against all persons not having antecedent liens; in other words, the sovereign was entitled to a preference over private creditors whose claims stood on the same footing as those of the state (23 Am.Jur. 823),'' and adds: ''The court in the first *Biscailuz* case reached a result which provided substantially the same priority for the State as prevailed in relation to the English Crown,'' while correctly pointing out that the court did not rest its decision upon the common law concept of the sovereign priority.

(A.O.B., p. 17.) That, we think is an unnecessarily severe stricture. Mere failure to mention a clause of a statute construed does not necessarily signify it was not considered, especially where, as here, that clause does not indisputably have the clearly unequivocal and pivotally significant meaning which the state would ascribe to it. That meaning, thus ascribed, is that the specific exception of prior recorded liens and preferred labor claims conclusively demonstrates a deliberate legislative intent to bar, as exceptions, all other liens and interests of other creditors and thus characterizes the main clause of section 6756 (the tax "shall be satisfied first" whenever the taxpayer is insolvent) as putting the state's claim ahead of all other creditors except preferred labor claimants and the holders of prior recorded liens.

Upon the contrary, it is just as easy and just as logical to read those last two sentences as cautionary and illustrative, not narrowly restrictive and exclusionary, in purpose and nature. It is a quite common device in any written instrument, after stating a general proposition, to give an illustration or two of what it does or does not include. For example, section 6359 of the Revenue and Taxation Code exempts from the sale and use taxes "the storage, use, or other consumption in this State of *food products for human consumption.*" (Emphasis added.) Then follow four sentences. Two declare that "Food products" include certain things. Two declare that "Food products" do not include various specified items. Certainly, no one would claim that these explanatory lists of inclusions and exclusions furnish the full measure and scope of the expression "food products for human consumption." (For some of the case law on this subject, see *Oil Workers Intl. Union* v. *Superior Court,* 103 Cal.App.2d 512, 571 [230 P.2d 71].) █ It is a fair inference, therefore, that when it wrote in the exceptions expressed in the last two sentences of section 6756, the Legislature did so merely by way of illustration, not at all as a complete enumeration of exceptions.

For the reasons stated, we do not undertake a detailed analysis and reappraisal of the provisions of section 6756. We accept the interpretation made by the court in the first Biscailuz case and applied by the trial court in the instant case.

█ (2) *Was the dealer's assignment to Gregory of a portion of the "Dealer's Reserve Account" effective as against the state in view of the failure to record notice of the assignment pursuant to sections 3017-3029 of the Civil Code?*

On November 3, 1949, Robert Gregory loaned Durkin approximately $2,250 to purchase an automobile for resale. Durkin being unable to repay, in writing assigned to Gregory $2,250 of his "Dealer's Reserve Account" held by the bank that financed his sales. On the same day, this assignment was presented to and in writing accepted by the bank.

The principal question is whether or not the "Dealer's Reserve Account" was an "account" as defined in section 3017. If not, recordation of notice was not required for perfecting the assignment. The trial court held that such recordation was not required.

The "Dealer's Reserve Account" was created and governed by contract between the dealer and the bank which held the account. The dealer financed many of his sales by means of conditional sales contracts between him and his customers. Each contract specified the unpaid balance and the interest rate. He sold or assigned many of these contracts to the bank pursuant to the terms of an "Automobile Repurchase Agreement"[3] which provided for the withholding by the bank of a determinable amount whenever it purchased a contract and the placing of that amount to the credit of the dealer in a "Dealer's Reserve Account." As each new conditional sales contract was sold to the bank, the balance credited to the dealer in this account rose; as car buyers defaulted on their contracts, or as car buyers paid off early, the balance fell. In effect, it would seem, the bank held out a portion of the purchase price of each sales contract it acquired from the dealer, set that amount up on its books to his credit, and

[3] The salient features of this agreement may be summarized as follows: (a) The bank could refuse to purchase any unacceptable conditional sales contract; (b) after purchase of a contract the bank would have the right to make collections and receive payments directly from the buyer; (c) the dealer guaranteed each contract sold to the bank; (d) the bank would purchase the contracts at a rate (called a "discount rate") to be determined from time to time by the dealer and the bank; (e) upon purchase of a contract by the bank, the agreed discount rate would be applied to the balance on the contract to determine the amount to be received by the bank and the dealer would be immediately paid said balance; (f) if the rate of interest under the contract was higher than the discount rate, the excess owed and to be paid by the buyer over the amount financed and the discount rate was entered on the books of the bank as a credit to the dealer and entitled "Dealer's Reserve Account"; (g) the amounts thus credited in this account were not paid immediately to the dealer by the bank but were retained as security for the performance by the dealer of his obligation to the bank, as guarantor of the conditional sales contracts sold to the bank; (h) the sums in this account could not exceed 5 per cent of the total conditional sales contract balance outstanding unless the bank was of the opinion that the dealer's credit standing or financial responsibility was impaired.

held it as security for the performance of his guaranty that the obligor on the sales contract would pay in full.

"The 'Dealer's Reserve' account feature of the Repurchase Agreement," says the state, "is merely a security arrangement for the protection of the bank." The state does not claim that the automobile repurchase agreement or the assignment of any conditional sales contract pursuant to the provisions of that agreement, was defective in the slightest degree. This apparently is in tacit recognition of the fact that the provisions of the agreement entered into and became a part of the terms of the transfer of each conditional sales contract and that each such transfer was perfected against third persons by assignment from the dealer to the bank without notice to the contract obligor, as sanctioned by section 955[4] of the Civil Code, plus the fact that an "account" which was represented by an "instrument for the payment of money" was not within the purview of sections 3017-3029 of the Civil Code.

The assignment of a $2,250 interest in this "Dealer's Reserve Account" was perfected as against third persons by written assignment from the dealer to Gregory and notice to the bank, unless this is an "account" as defined in subdivision (1) of section 3017 of the Civil Code: "'Account' means an open book account, mutual account, or account stated, due or to become due, carried in the regular course of business and not represented by a judgment, note, draft, acceptance, or other instrument for the payment of money; it includes rights under an unperformed contract for work, goods or services which in the regular course will result in an open book account." (As amended by Stats. 1945, ch. 295, p. 756.)

[4]"The transfer of a contract of conditional sale shall be deemed perfected against third persons when such contract has been indorsed or assigned in writing and delivered to the transferee, whether or not notice of such assignment has been given to the obligor . . ." (Civ. Code, § 955; Stats. 1941, ch. 1025, p. 2655.)

Prior to the enactment of section 955 in 1941 the rules applicable to the assignment of a nonnegotiable chose in action governed the assignment of a conditional sales contract (see *C.I.T. Corp.* v. *Glennan,* 137 Cal.App. 636, 638-639 [31 P.2d 430].)

Those rules until modified by the 1943 addition of sections 3017-3029 to the Civil Code required notice to the debtor in order to perfect an assignment against a subsequent assignee for value without notice (*Smitton* v. *McCullough,* 182 Cal. 530, 535 [189 P. 686]; 3 Cal.Jur. 283-284, § 35; 17 So.Cal.L.Rev. 303; 41 Cal.L.Rev. 333, 335).

The state claims that the "Dealer's Reserve Account" was an "open book account" as that term was used in section 3017; hence, that the assignment to Gregory of an interest therein without the filing required by section 3019 was ineffective, at least as against the state.

This "Dealer's Reserve Account" does not bear the earmarks of an "open book account" in the traditional sense of that term. The following definition has been quoted with approval: "The expression 'outstanding and open account' has a well-defined and well-understood meaning. In legal and commercial transactions it is an unsettled debt arising from items of work and labor, goods sold and delivered, and other open transactions, not reduced to writing, and subject to future settlement and adjustment. It is usually disclosed by the account books of the owner of the demand, and does not include express contracts or obligations which have been reduced in writing, such as bonds, bills of exchange, or promissory notes." (1 Ruling Case Law 207; quoted with approval in *Mercantile Trust Co.* v. *Doe*, 26 Cal.App. 246, 253-254 [146 P. 692]; *People* v. *California Safe Deposit & Trust Co.*, 41 Cal.App. 727, 733 [183 P. 289]; *Fresno Credit Bureau* v. *Batteate*, 102 Cal.App.2d 545, 547 [227 P.2d 851].)

An express contract, which defines the duties and liabilities of the parties, whether it be oral or written, is not, as a rule, an open account. (*Lee* v. *DeForest*, 22 Cal.App.2d 351, 360 [71 P.2d 285]; *Cleaveland* v. *Inter-City Parcel Serv., Inc.*, 22 Cal.App.2d 574, 581 [72 P.2d 179]; *Tillson* v. *Peters*, 41 Cal.App.2d 671, 677 [107 P.2d 434].)

"Sums which become due under an express contract (such as rent under a lease) are not ordinarily treated by the parties as items of an open account. [Citations.] If they are not so considered by the parties, one party cannot evade the bar of the statute of limitations by pleading an open mutual, current account or book account. [Citation.] However, rent may by mutual understanding of the parties become an item in an open account; in such a case the cause of action is upon the account, not under the lease. [Citation.]" (*Parker* v. *Shell Oil Co.*, 29 Cal.2d 503, 507 [175 P.2d 838].)

It is not clear that in our case the transactions of the dealer and the bank pursuant to the provisions of the Automobile Repurchase Agreement could be kept in such a manner as to constitute an "Open book account." Even if that were feasible, there is an absence of evidence in the record before us concerning what books they kept, what

entries they made in those books, and whether they treated such entries as items of an open book account. Accordingly, this record furnishes no basis for us, a reviewing court, to disturb the findings of the trial court and hold, as a matter of law, that the dealer and the bank did record their transactions in such fashion that they could and did treat this as an open book account.

We conclude that the "Dealer's Reserve Account" was not an open book account as the latter term is used in section 3017 and that the assignment to Gregory became effective upon notification of the bank, without filing pursuant to section 3019.

Added support for this conclusion is furnished by the history of legislative enactments and judicial decisions affecting nonnotification financing of accounts receivable. A brief description of that method of financing is furnished by Vernon X. Miller in 22 Marquette Law Review 28: "An assignment of accounts receivable is a popular security device. The lender agrees to extend credit to the borrower and he demands security. The borrower agrees to pledge the accounts on his books to secure a loan. He furnishes the creditor with a formal list of the accounts. He agrees to furnish additional lists at specified times in the future. It is assumed by both that if the debtor does not pay when the loan matures, the creditor can reach the accounts. Apparently the debtor can carry on business as usual and the credit is protected against the debtor's insolvency." More detailed descriptions of this method of financing are furnished by Maximilian Koessler in "*Assignment of Accounts Receivable*," 33 Cal.L.Rev. 40 at 56 et seq., and by Prochnow and Foulke in "Practical Bank Credit," 2d edition, page 424 et seq. Nonnotification of the customer-debtor of the assignment of his account appears for various reasons to be a much desired and favored feature of this method of financing. (17 So.Cal.L.Rev. 303; 33 Cal.L. Rev. 46, 59-61; 38 Cal.L.Rev. 308.)

This was the type of accounts receivable financing which was involved in *In re Quaker Sheet Metal Co.* (3d Circ., 1942), 129 F.2d 894, affirmed in *Corn Exchange Bank* v. *Klauder* (March, 1943), 318 U.S. 434 [63 S.Ct. 679, 87 L.Ed. 884, 144 A.L.R. 1189]. The Quaker City company being in need of working capital arranged with the Corn Exchange Bank to advance money from time to time for payroll and other needs "on currently made assignments of accounts receivable" As it happened, some of these assignments were

made less than four months before the filing of an involuntary petition in bankruptcy. Because this transaction occurred in Pennsylvania and Pennsylvania law required notification of the customer-debtor before the assignment became complete as against subsequent assignees for value, the court held that the questioned assignments to the bank were ineffective as against the trustee in bankruptcy in view of the provisions of section 60(a) of the Bankruptcy Act as amended by the Chandler Act of June 22, 1938 (52 Stats. 840, 869-870).

This decision gave impetus to the urge for state legislation designed to foster nonnotification financing of accounts receivable in a manner that would obviate the results of the decision. This legislation took various forms in different states. Some required recordation of the assignment or of the intention to assign, some required book marking, some made the assignment effective as of its date without recording or book marking. A brief description of this movement and its purpose appears in the Handbook of the National Conference of Commissioners on Uniform State Laws (1944) at pages 172-189. A more extended discussion appears in *"Assignment of Accounts Receivable," supra,* 33 Cal.L.Rev. 46-113.

There is no doubt that chapter 766 of the California Statutes of 1943, page 2542, adding sections 3017-3029 to the code (described in its title as "An act . . . relating to the assignment of accounts receivable and providing for the giving of notice thereof"), was designed to facilitate nonnotification financing of accounts receivable by substituting the filing requirements of section 3019 for the former requirement that each customer-debtor be notified of the assignment. (See 38 Cal.L.Rev. 308-309; 17 So.Cal.L.Rev. 303, 306.) In our case, the dealer and the bank had no need for such a remedy. Here the "accounts receivable," being in the form of conditional sales contracts, were readily transferable without notice to the customer-debtor. There was no occasion to impose filing requirements to facilitate nonnotification financing of such accounts. Similarly, there was no occasion, in furtherance of such financing, to impose filing requirements upon the manufacturer, merchant or dealer whenever he chose to convey an interest in credits accruing to him from the bank that financed these accounts for him, because there was no conceivable reason, in fact or in fancy, for not notifying the debtor-bank as was immediately done in the instant case.

(3) *Do the evidence and the findings support the legal conclusion that Peter Milan and Lew Irvine acquired liens*

*upon the "Dealer's Reserve Account" and the "Special Hold-back Account"[5] which are traceable into the funds which the bank paid into court?*

In an action brought by Peter Milan and Lew Irvine against Durkin, a writ of attachment was issued and served upon the bank on November 2, 1950, thus creating a lien in their favor in both accounts.

They obtained judgment in that action and a writ of execution was issued and served January 8, 1951, on the bank. Nothing further happened until March 2, 1953, when a new writ of execution was issued and on March 4th served upon the county treasurer who made return that the funds were *in custodia legis.*

Meanwhile, pursuant to the bank's cross-complaint in interpleader the court on May 26, 1952, ordered the bank to deposit with the clerk of the court the sum of $4,924.52.[6] The deposit was made and on June 12, 1952, the court dismissed the bank from the action, free from liability.

Meanwhile, also, the state acquired its lien on both accounts by warrants issued pursuant to section 6776, Revenue and Taxation Code. These warrants were issued for a single period of tax liability but from time to time so as to include accruing interest, adjustments for payments received, and for renewal purposes. Issued August 1 and October 10, 1951, and January 14, 1952, they were respectively served August 7 and October 18, 1951, and January 17, 1952.

From this it appears that the lien which Milan and Irvine obtained by levy of the writ of execution expired on January 8, 1952, one year after the issuance of the writ (Code Civ. Proc., § 688; *Puissegur* v. *Yarbrough,* 29 Cal.2d 409 [175 P.2d 830]).

The levy which was made on March 4, 1953, was ineffective because the property was then *in custodia legis.* Milan and Irvine concede that the property was *in custodia legis* at that time. They contend, however, that the property was taken

---

[5]The "Special Holdback Account" was established by the bank to the credit of Durkin as additional security for the guarantee by him of the conditional sales contracts sold to the bank. The sums represented by this account were withheld from the amounts which were paid in cash to Durkin at the time of the sale of a conditional sales contract to the bank. The percentage which was withheld on each contract was agreed upon between Durkin and the bank.

[6]Of this sum, $4,741.99 represented the balance in the "Dealer's Reserve Account"; $182.53, the balance in the "Special Holdback Account."

into legal custody before their execution lien expired. They are mistaken. ■ In a proceeding in interpleader the moneys in question do not come into legal custody until actually paid into court upon an order of court therefor. (*Van Orden* v. *Anderson,* 122 Cal.App. 132, 141 [9 P.2d 572]; *Union Bank & Tr. Co.* v. *Los Angeles County,* 2 Cal. App.2d 600, 609 [38 P.2d 442].) Here that did not occur until after the expiration of the one-year period following issuance of the writ of execution.

These respondents further contend that their attachment continued in force for three years and thus continued the life of their lien until after the property entered legal custody. They rely upon section 542b of the Code of Civil Procedure which declares that an attachment or garnishment on personal property "shall, unless sooner released or discharged, cease to be of any force or effect and the property levied on be released from the operation of such attachment or garnishment, at the expiration of three years after the issuance of the writ of attachment under which said levy was made . . ." This, we observe, is not an affirmative statement that a garnishment shall endure for three years unless sooner released or discharged. It is a statement that it shall not endure longer than three years. This is consistent with the traditional concept that the lien of an attachment is merged in the lien of the judgment in the case of real property or with the lien of a writ of execution in the case of personal property. (See discussion in *Bagley* v. *Ward,* 37 Cal. 121, 131 [99 Am.Dec. 256], as to real property; and in *Balzano* v. *Traeger,* 93 Cal.App. 640, 643-644 [270 P. 249], as to personal property.) No California decision deciding this precise question has come to our attention. In *Puissegur* v. *Yarbrough, supra,* 29 Cal.2d 409, 412, the three-year period against the attachment as well as the one-year period against the execution levy had run. The same was true in *W. J. Jones & Son, Inc.* v. *Independence Indem. Co.,* 52 Cal.App.2d 374, 378 [126 P.2d 463]. ■ In New York the question has been decided. There, it is definitely settled that the lien of an attachment upon personal property merges and terminates in the lien of the execution levy. (*Castriotis* v. *Guaranty Trust Co.,* 229 N.Y. 74 [127 N.E. 900, 902]; *Marks* v. *Equitable Life Assur. Soc.,* 109 App.Div. 675 [96 N.Y.S. 551, 552]; and earlier cases cited in each.)

Accordingly, we hold that the same rule obtains in California and that the portions of the judgment which declare

that Peter Milan and Lew Irvine have liens in the "Dealer's Reserve Account" and in the "Special Holdback Account" now on deposit with the clerk of the court and that such liens are superior to the liens of the state therein, must be reversed.

(4) *Errors asserted by the respondents are not available to them.*

One of the respondents says that the evidence which tends to prove that Durkin was insolvent is "scanty," and the other respondents seem to concur. They furnish no basis for a reviewing court to disturb the trial court's finding that Durkin has been insolvent at all times since June, 1949. Also, not having appealed, respondents are not in a position to urge the point. (*State* v. *Day,* 76 Cal.App.2d 536, 551 [173 P.2d 399]; *Hudgins* v. *Standard Oil Co.,* 136 Cal.App. 44, 48-49 [28 P.2d 433].)

Respondent Gregory additionally requests this court to grant his claim for interest and attorney fees which the trial court denied him. As a nonappellant he is in no position to make such a claim.

Those portions of the judgment which award Peter Milan and Lew Irvine liens in the funds on deposit and declare such liens superior to those of the state are reversed with directions to revise those portions in accordance with the views herein expressed; all other portions of the judgment appealed from are affirmed. It is ordered that the successful respondents Robert Gregory and Rollen F. Campbell shall recover costs on appeal against the state; the state shall recover costs on appeal against respondents Peter Milan and Lew Irvine.

Peters, P. J., and Bray, J., concurred.

The petition of appellant State of California for a hearing by the Supreme Court was denied July 20, 1955.