[Civ. No. 10509. Third Dist. June 5, 1963.]

NORTHERN COUNTIES BANK, Plaintiff and Appellant,
v. EARL HIMOVITZ & SONS LIVESTOCK COM-
PANY, Third Party Claimant and Respondent.

Brobeck, Phleger & Harrison, David Lennihan and Arthur C. Powell for Plaintiff and Appellant.

Hagen & McInturff and Pat S. McInturff for Third Party Claimant and Respondent.

FRIEDMAN, J.—We granted a rehearing in this case because at the time of preparing our original opinion we were under a misapprehension concerning an important circumstance. The circumstance involved the actual date and the conditions under which a negotiable draft bearing date of November 30, 1960, was issued to Himovitz, the third party claimant. Both parties to this appeal agree as to the actual event. Not by way of complaint but simply in passing, we note that appellate courts do not have the benefit of trial court findings in third party claim proceedings.

Jack Rose was an independent cattle buyer and feeder. During 1959-1960 his operations were financed by Earl Himovitz and Sons Livestock Company. Rose would select cattle and agree to buy them in his own name. Himovitz would advance the funds. Rose and Himovitz would then sign a so-called "sale and repurchase agreement." According to this agreement Himovitz would "purchase" the cattle; Rose would

pay Himovitz a deposit of $20 per head and agree to "repurchase" the cattle at the end of the feeding period. During the feeding period risk of loss was borne by Rose and the cattle bore his brand. The "repurchase" price would be calculated to pay Himovitz the remainder of his advance, plus interest and a "commission" of $2.50 per head. The agreement required that Himovitz receive payment before the cattle were shipped from the feed lot. In actual practice this requirement was relaxed. For some months Himovitz permitted Rose to deliver cattle to his customers, who then remitted to Himovitz. Later, Himovitz permitted Rose to receive direct payment from his own customers. Rose then would pay Himovitz. The "sale and repurchase" agreements were not recorded.

Diamond Meat Company was one of the packers to whom Rose sold cattle. In November 1960 Himovitz learned that Rose was in financial difficulty. In order to bolster his own security Himovitz decided to withdraw his consent to the arrangement by which Rose received sales proceeds directly from his customers. About November 16, 1960, Himovitz notified Rose's customers, including Diamond Meat Company, of his interest under the "sale and repurchase agreement" and demanded that future remittances of sales proceeds be paid directly to him rather than to Rose.

On November 18, 1960, Himovitz and Rose called personally upon Diamond Meat Company. At that time Diamond owed Rose for certain cattle. Diamond drew several drafts payable to Himovitz alone or payable to Rose and Himovitz jointly. At that time Rose also had certain cattle in Diamond's hands on a consignment basis. Diamond was to pay Rose for these cattle after they were sold or slaughtered, and after Diamond received payment from its own customers. As between Diamond and Rose, the price was to be measured by the market value of the cattle at the time of sale or slaughter. At the November 18 meeting Himovitz orally informed Diamond that the cattle in the latter's hands were "under contract to me and that the proceeds must and should come to me." Rose concurred in this instruction.

Plaintiff Northern Counties Bank, a creditor of Rose. brought suit against him. It sought attachment of the cattle in the hands of Diamond. On November 22, 1960, a constable delivered a notice of levy and a copy of attachment writ to Diamond. The constable's return shows that he levied

on, and Diamond stated that it had in its possession, two truckloads of cattle. The constable did not take the cattle into his possession. Diamond then butchered the cattle and on November 29 presented a written statement to the constable that it was ''holding, per writ of attachment No. 14924 served November 22, 1960, payment for cattle owned by Jack Rose and Earl Himovitz'' the sum of $15,263.27.

On November 30 Diamond issued a draft payable to Himovitz in the identical sum of $15,263.27. Himovitz then presented the draft through banking channels but payment was refused. Himovitz then filed a third party claim alleging that at the time of the levy Diamond had purchased the cattle and demanding that the money held by Diamond be paid to it. After a hearing the court below upheld the third party claim of Himovitz, rejecting that of plaintiff, the attaching creditor. Plaintiff appeals.

██ An attaching creditor acquires only the interest his debtor possesses. (*Kinnison* v. *Guaranty Liquidating Corp.,* 18 Cal.2d 256, 263 [115 P.2d 450].) ██ If the thing sought by the November 22 levy—whether cattle, debt or money—belonged to Himovitz, then the levy was ineffectual. ██ Plaintiff argues that the November 18 transaction was only an attempt to assign orally to Himovitz an expectancy of money which might be owing at a later date; that on November 22 Rose was owner of the cattle in Diamond's hands; that the attachment levy was a garnishment of cattle, not money; that the subsequent (unauthorized) sale by Diamond did not defeat the lien of attachment which came into being on November 22; that even if an assignment occurred, it violated the statutes (Civ. Code, §§ 3017, 3018) requiring recordation of assignments of accounts receivable. Finally, plaintiff contends that the original ''sale and repurchase'' agreement between Himovitz and Rose was either an unrecorded chattel mortgage or an unrecorded conditional sale of cattle, void as to Rose's creditors under Civil Code section 2957 or section 2980.5.

One of the recurrent ironies of adjudication is the necessity of fitting business transactions into the pigeonholes of standardized legal concepts, when the actors were actually thinking only of money. From such characterizations, conceived after the fact by lawyers and judges, flow secondary consequences hardly foreseen by the actors themselves. Sometimes the available legal concepts overlap, and refined

distinctions become necessary in order to pin an accurate description on the transaction. Overlapping and possible theories here are the concepts of assignment, bailment and novation. The trial court observed and the parties have debated a single legal relationship, an assignment or equitable assignment, resulting from the November 18 transaction between Rose, Himovitz and Diamond. It has seemed necessary to us to consider the other possibilities. The difficulty of accurate characterization is compounded by the absence of findings in third party claim appeals. We have concluded that the proceeding should be remanded to the trial court for further hearing and determination in the light of this opinion. It will be our purpose to set forth adequate "law of the case" so that, if possible, the matter may be finally determined in the trial court and further appeal avoided.

The trial court adopted the theory that there was an assignment of money to become due when Diamond sold or butchered the cattle; that such an assignment created a present equitable charge on the cattle which were to produce the money; that this charge or right defeated the claim of plaintiff, the assignor's attaching creditor. (See *Kinnison* v. *Guaranty Liquidating Corp., supra,* 18 Cal.2d at 264; *McIntyre* v. *Hauser,* 131 Cal. 11, 13 [63 P. 69] ; *Gintel* v. *Green,* 165 Cal.App. 2d 723, 725 [332 P.2d 298] ; *Smith* v. *Harris,* 127 Cal.App.2d 311, 316 [273 P.2d 835].) Accordingly, the trial court sustained the third party claim of Himovitz.

Appellant argues that on November 18, 1960, Rose did not have any assignable interest to transfer to Himovitz. Aside from statutory formalities, an assignment of money to become due under an executory contract of sale is entirely valid. (*Fricker* v. *Uddo & Taormina Co.,* 48 Cal.2d 696, 701 [312 P.2d 1085] ; *H. S. Mann Corp.* v. *Moody,* 144 Cal. App.2d 310 [301 P.2d 28] ; *H. D. Roosen Co.* v. *Pacific Radio Publishing Co.,* 123 Cal.App. 525 [11 P.2d 873].) The essential need is a bona fide agreement for a sufficient consideration and without intent to defraud creditors. (*Smith* v. *Harris, supra,* 127 Cal.App.2d 311, 316.) The antecedent debt from Rose to Himovitz was ample consideration for the transfer. (*First National Bank* v. *Pomona Tile Mfg. Co.,* 82 Cal.App.2d 592, 607 [186 P.2d 693].) There is no issue of bad faith here; Himovitz was acting in legitimate protection of his own interest as Rose's creditor. That the assignment was oral does not defeat it in the absence of some

statutory demand for writing or recordation. (*Oswald* v. *Schwartz,* 181 Cal. 620, 624 [185 P. 959].) ▮ The general rule is that the assignee of a chose in action has priority over a later attaching creditor of the assignor, even though the creditor knows nothing of the assignment. (*McIntyre* v. *Hauser, supra,* 131 Cal. 11; Rest., Contracts, § 172.)

▮ The general rule providing priority to the assignee must be appraised in the light of statutory formality requirements. The record does not reveal whether application of Civil Code sections 3017-3029, requiring filing or recordation of assignments of accounts receivable, was debated in the court below. There is some indication in the briefs of trial court argument on the subject of recordation. At any rate, the problem has been argued in the briefs on appeal. It is a question of substance going to sufficiency of the third party claimant's assertion of title, and we deem it appropriate to consider the matter on appeal.

▮ Principal purpose of sections 3017-3029 is protection of lenders who engage in nonnotification financing secured by assignments of accounts receivable. (*H. S. Mann Corp.* v. *Moody, supra,* 144 Cal.App.2d at 313, 315; *Costello* v. *Bank of America,* 246 F.2d 807, 810-811.) They achieve this objective by permitting a lender to lend money on the security of an assignment of ''accounts,'' which assignment, when filed for record, receives priority over the claim of a subsequent assignee, even though the customer-debtors of the accounts have not been notified of the assignment. (*Durkin* v. *Durkin,* 133 Cal.App.2d 283, 291-292 [284 P.2d 185].) ▮ Section 3018, however, not only declares the priority of a first assignment after it has been filed, it also provides:

''Except as to any credit extended by a creditor after the notice provided for in this chapter is filed, an assignment of an account shall be invalid as against any creditor of the assignor without actual notice unless notice of or of intention to make the assignment as provided for in this chapter is filed at the time of or before the execution of the assignment or within five days thereafter.''

The quoted provision demonstrates a secondary statutory purpose, that is, to protect the assignor's creditors against secret assignments. It requires the assignee of an ''account'' to file his assignment in order to protect his rights not only as against subsequent assignees, but also as against the creditors of the assignor. (*Costello* v. *Bank of America, supra,* 246

F.2d at 811; see also *Reeg* v. *West*, 160 Cal.App.2d 617 [325 P.2d 164].) Thus, if applicable, these provisions change the nonstatutory California doctrine, relied upon in the court below, which gives the assignee priority over the assignor's subsequent attaching creditor.

The term "account" is artificially defined in subdivision (1) of Civil Code section 3017.* As originally enacted in 1943, the definition was comparatively narrow, being largely confined to book accounts maintained in the regular course of the assignor's business, excluding debts upon express or special contracts. (*Durkin* v. *Durkin, supra,* 133 Cal.App.2d 283; *Costello* v. *Bank of America, supra,* 246 F. 2d 807; *In re Richards,* 108 F.Supp. 259.) As amended in 1953, however, the definition of "account" was broadened, with some specific exceptions, to cover "a debt . . . to become due, arising out of the sale, . . . of tangible personal property, or arising out of a contract therefor. . . ." (Stats. 1953, ch. 1242; see U.C.L.A. L.Rev. 806 at p. 819 (1961).) A debt not yet in existence may fall within the statutory definition of "account." (*H. S. Mann Corp.* v. *Moody, supra,* 144 Cal.App.2d at pp. 319-321.)

Thus, if the November 18 transaction between Rose and Himovitz was a transfer of a debt which would become due from Diamond Meat Company to Rose, there was a transfer

---

*Subdivision (1) of section 3017, Civil Code, provides:

"(1) 'Account' means a debt, due or to become due, arising out of the sale, storage, transportation, care, repair, processing, manufacture or other improvement of tangible personal property, or arising out of a contract therefor, or arising out of the rendition of personal services which in the regular course of business will result in an open book account, provided, however, that 'account' does not include:

"(a) Any debt evidenced by or arising under a judgment, note, bill of exchange, acceptance, chattel mortgage, trust receipt, lease, or contract of conditional sale (meaning a deferred payment contract reserving title in the seller);

"(b) Any debt which arises from the sale of tangible personal property or from the sale or assignment of the rents, issues, profits, products, proceeds or increase of tangible personal property, if at the time of the assignment of such debt the assignee is the owner of an encumbrance or a lien, other than a lender's lien pursuant to section 3031 of the Civil Code, upon the said personal property, which lien or encumbrance has been duly perfected against third persons pursuant to any applicable state or federal law or is so perfected within 10 days after the assignment of such debt;

"(c) Any debt arising under a contract for a work of improvement to real property as defined in section 1182 of the Code of Civil Procedure or a public work of improvement as defined in section 4200 of the Government Code."

of an "account" within the broadened definition of section 3017.

Subdivision (1)(b) of section 3017 excludes from filing requirements an assignment of a debt arising from sale of tangible personal property if the assignee holds a duly perfected lien or encumbrance on the same property. Here, Himovitz held a lien or encumbrance which was anything but perfected. His so-called "sale and repurchase" agreement with Rose was a hybrid creation which did not cover a real sale but was intended to provide Himovitz with security for cattle purchased by Rose with money advanced by Himovitz. It was either a disguised chattel mortgage, void as to Rose's creditors because not recorded as demanded by Civil Code section 2957, or a conditional sale of cattle, subject to the recordation demands of section 2980.5. Not being perfected as to Rose's creditors, Himovitz's security interest in the cattle did not lift the transaction out of the section 3017 definition of "account."

Section 3018 permits an assignee to file notice within five days after the assignment. The levy of attachment was made on November 22, 1960, which was only four days after the claimed assignment from Himovitz. On November 22 Himovitz had not yet failed to comply with the filing statute. Under these circumstances he had protection against the intervening attachment by plaintiff, providing that he did comply. His failure to file on the fifth day, however, deprived him of the statute's protection and subordinated his position, as claimed assignee, to that of the attaching creditor. (*Bloomingdale Bros., Inc.* v. *Cook*, 8 N.J.Misc. 824 [152 A. 666, 668]; 45 Am.Jur., Records and Recording Laws, § 54.)

To the extent, then, that Himovitz's third party claim rests on an assignment of cattle proceeds to become due from Diamond to Rose, it is invalid as to plaintiff, Rose's attaching creditor, because of Himovitz's failure to file it in compliance with Civil Code section 3018. An invalid assignment of the cattle proceeds cannot be the basis of an equitable assignment of the cattle. If assignment of money to become due falls within the ban of Civil Code section 3018, so does the equitable assignment of the chattels.

So much for the equitable assignment approach. Its failure to support the position of the third party claimant requires reversal of the judgment. Availability of other theories, dependent on evidence and on factual determinations, makes

it evident, however, that the ultimate rights of the parties cannot be settled on this appeal.

The parties have assumed that Diamond received the cattle from Rose as a consignee for sale. They have not debated the legal questions stemming from that assumption. ■ A consignment of goods for the purpose of sale ordinarily constitutes a bailment. (*Perera* v. *Panama-Pacific Intl. Exposition Co.*, 179 Cal. 63, 64 [175 P. 454]; 7 Cal.Jur.2d, Bailments, § 4; 8 Am.Jur.2d, Bailments, § 34; 8 C.J.S., Bailments, § 3; 4 Williston on Contracts (rev. ed.) § 1035.) ■ If, however, the parties to the transaction intend passage of title, the transaction may be regarded as a contract of sale rather than a bailment. In determining which event occurred, bailment or contract of sale, the intent of the parties is controlling. (8 Am.Jur.2d, Bailments, § 35; 8 C.J.S., Bailments, § 3.) ■ The bailor may sell or otherwise transfer the subject matter of the bailment and confer on the transferee an immediate and valid title without the necessity of formal delivery. (8 Am.Jur.2d, Bailments, § 84; 8 C.J.S., Bailments, § 32.) Again, the question is one of intent. Intent questions, of course, are entirely factual.

The character of the transaction between Rose and Diamond Meat Company, whether a bailment or contract of sale, would profoundly influence the claim of plaintiff, Rose's attaching creditor. The character of the November 18 transaction between Rose, Himovitz and Diamond, whether an assignment of sale proceeds or a sale of bailed cattle in consideration of an antecedent debt, vitally affects the position of the attaching creditor. Facts which will assist in determining which of these various relationships occurred may be developed on retrial.

■ Another possibility is that the November 18 transaction between Rose, Himovitz and Diamond constituted a novation. A novation would consist of a complete substitution of obligations, that is, the Rose-Himovitz debt and the Diamond-Rose obligation would be simultaneously replaced by a new obligation running directly from Diamond to Himovitz. (Civ. Code, §§ 1530, 1531.) ■ Existence of a novation turns on the parties' intention to discharge the old contract and substitute a new one. (*Alexander* v. *Angel,* 37 Cal. 2d 856, 862 [236 P.2d 561]; *Ehrenreich* v. *Shelton,* 213 Cal.App.2d 376, 381 [28 Cal.Rptr. 855]; *San Gabriel Valley Ready-Mixt* v. *Casillas,* 142 Cal.App.2d 137, 140 [298

P.2d 76].) ▮ Thus, a determination for or against nova-tion is primarily factual. Although, on November 30, Diamond issued a draft to Himovitz covering the market price of the cattle as ascertained at some time between November 18 and November 30, that action was taken in apparent ignorance of the perils created by possible dishonor of the attachment. Diamond apparently then sought legal advice and stopped payment of the draft. Issuance of the November 30 draft does not conclusively demonstrate an intended novation. Whether other available evidence demonstrates an intended novation is a matter which should be left to further hearing and determination.

The judgment is reversed and the cause remanded for further proceedings.

Pierce, P. J., and Schottky, J., concurred.