[Civ. No. 34685. Second Dist., Div. Four. May 4, 1970.]

CONTINENTAL BANK, Plaintiff and Respondent, v.
LLOYD E. BLETHEN, Defendant and Appellant.

---

**COUNSEL**

Walleck, Shane & Baechtold and David L. Shane for Defendant and Appellant.

Caidin, Bloomgarden & Kalman and Newton Kalman for Plaintiff and Respondent.

## OPINION

**FILES, P. J.**—The parties to this appeal are the successive assignees of the accounts receivable of a hotel. The trial court, sitting without a jury, found that defendant Blethen, the assignee first in time, had collected $8,491.53 on accounts which had been lawfully assigned to plaintiff Continental Bank, who had obtained priority by filing the notice prescribed in former Civil Code section 3018. The court therefore gave judgment in favor of the bank against Blethen in the amount of $8,491.53 plus prejudgment interest in the amount of $3,607.86. Blethen is appealing from this judgment.

Those of the underlying facts which are not in dispute will be stated first.

Under date of February 12, 1962, Blethen and Samuel J. DeSarno[1] executed instructions addressed to Prudential Escrows, of Palm Springs. These instructions recited that Blethen would pay into the escrow $10,000, to be used when the escrow held the promissory note of DeSarno in that amount. The instructions included this: "You are further authorized and instructed to advise American Express, Diners Club and Carte Blanc [*sic*] that all sums due Samuel J. De Sarna [*sic*] DBA HOWARD MANOR, Palm Springs, California, are to be paid direct to this escrow, commencing April 1, 1962, to apply on final payment of Note."

Blethen did deposit $10,000 in the escrow, which was paid out to DeSarno or pursuant to his directions.

No notice of assignment of accounts receivable under Civil Code section 3018 was filed.[2]

On April 5, 1962, the bank entered into a written agreement with "Howard Manor," which set forth the terms under which "Howard Manor" would sell to the bank "such accounts belonging to Assignor as may be

---

[1] The complaint names DeSarno as well as Blethen as a defendant, and the judgment is given against "defendants." The record fails to show any appearance by DeSarno. There is a statement by counsel that he "went into bankruptcy." The findings indicate the case was tried against Blethen only. We assume that the action was severed or dismissed as to DeSarno before trial, and that the use of the plural "defendants" in the judgment is a clerical error.

[2] The first paragraph of Civil Code section 3018 provides: "An assignment of an account is entitled to priority over any subsequent assignment of the same account; provided, that as between two or more assignees who receive written assignments for value without notice, the assignee whose notice of assignment or of intention to assign, is first filed as provided in this chapter is entitled to priority over all other assignees of the same account."

This section was repealed by the adoption of the Uniform Commercial Code, effective January 1, 1965.

acceptable to the Bank. . . ." DeSarno signed this agreement on behalf of the assignor.

Notice of assignment of accounts receivable by Howard Manor, assignor, to Continental Bank, assignee, was filed with the County Recorder of Riverside County April 9, 1962.

Commencing April 10, 1962, and approximately once a week thereafter, "Howard Manor, Inc." executed documents headed "schedule of accounts receivable assigned." Each of these forms, which was signed by "S. J. DeSarno, Pres.," expressly assigned to the bank the accounts receivable listed therein by name of debtor, invoice date and amount due. The first of these schedules listed among other accounts, Diners Club, invoice date April 9, amount $2,635.56. The next schedule, dated April 15, contained no Diners Club account. The third schedule, dated April 22, included Diners Club, invoice date April 22, amount $2,075.59. Subsequent schedules regularly listed Diners Club invoices in similar manner. The last assignment was July 13, 1962.

Altogether $14,506.06 of Diners Club accounts were assigned to the bank between April 10 and July 13. The only payment by Diners Club to the bank was $539.76 on April 24, 1962.

Diners Club paid $4,305.75 into the escrow on May 23, 1962, and $4,185.78 on June 27, 1962. These amounts were paid over to Blethen, and make up the $8,491.53 which the trial court concluded Blethen should pay to the bank.

The record contains no satisfactory showing as to the legal relationship between Samuel J. DeSarno, Howard Manor, and Howard Manor, Inc., except what can be deduced from the documents and from DeSarno's conduct. Both parties to this action appear to have assumed that all of the accounts receivable which were referred to in this record were the receivables of a hotel in Palm Springs operating under the name of Howard Manor. In view of this, the uncertainty as to legal entities involved is inconsequential on this appeal.

The contentions of the parties on this appeal will be discussed in relation to three issues: (1) If proceeds of accounts assigned to the bank were in fact paid to Blethen, may the bank recover them from Blethen? (2) Did Blethen in fact receive the proceeds of accounts assigned to the bank? (3) Is prejudgment interest a proper element of damage?

We must reverse the judgment because there is no evidence supporting the bank on the second issue. The other two must be discussed for guidance of the trial court in the event of a retrial.

## (1)

■ Under the literal reading of Civil Code section 3018 (fn. 2, *supra*) the bank, which filed notice of assignment, was entitled to priority over Blethen, who filed no notice. A Diners Club balance is an "account" within the meaning of the statute. (*Pingree* v. *Sulmeyer* (9th Cir. 1963) 315 F.2d 422.)

Under the court-made law which preceded the adoption of Civil Code sections 3017-3029 in 1943, the assignee who first notified the debtor had priority over other assignors. (*Graham Paper Co.* v. *Pembroke* (1899) 124 Cal. 117 [56 P. 627].) The 1943 statute allowed an assignee to file a notice with the county recorder, and thereby attain priority without notifying the debtors. This made it feasible for a business to raise working capital by assigning accounts receivable without informing its customers (who were the debtors) of what it was doing. The third paragraph of section 3018 provides that "A debtor, irrespective of the provisions of this chapter, until notified by the assignor or the assignee not to do so, may pay or otherwise deal in good faith with the assignor, . . ."

Thus, under the statutory scheme, the debtor, having no knowledge of the assignment, will in the ordinary course of business pay the assignor, who will turn the money over to the assignee. The assignee takes the "moral risk" that the assignor will faithfully pass along the proceeds of the accounts as they are collected and not misappropriate them; but the assignee relies upon the statute to give him protection against the insolvency of the assignor. (For historical explanation of the 1943 statute see *Costello* v. *Bank of America* (9th Cir. 1957) 246 F.2d 807; *Durkin* v. *Durkin* (1955) 133 Cal.App.2d 283, 291-292 [284 P.2d 185].)

■ Blethen contends that even if the bank had priority as to the accounts while uncollected, it was not entitled to follow the proceeds and recover from Blethen after collection. That the priority extends into proceeds was assumed in *H. S. Mann Corp.* v. *Moody* (1956) 144 Cal.App.2d 310 [301 P.2d 28]. In that case a plaintiff, who had recorded a notice of assignment, recovered from a subsequent assignee the amount of the money which the latter had collected by virtue of its assignment.

Although the point argued here was not discussed in the *Mann* case, we take it to be a correct application of California law.

The right of action against Blethen as a person receiving payment by mistake is supported by *Marshall* v. *Swaim* (1929) 102 Cal.App. 119 [282 P. 423], where rent paid to the wrong person by mistake was recovered by the person entitled in an action against the recipient.

Further support for such a recovery is found in *Widenmann* v. *Weniger*

(1913) 164 Cal. 667 [130 P. 421]. Although that case did not involve the accounts receivable statute, it is an example of a senior assignee recovering from a junior assignee the amount which had reached the latter from the common assignor.

Blethen argues that under the escrow arrangement which he made with DeSarno, the escrow company collected the Diners Club accounts as the agent of DeSarno. Blethen's theory seems to be that in effect Diners Club paid its debt to DeSarno, and DeSarno paid his debt to Blethen, and Blethen is not concerned with whether or not DeSarno wrongfully applied money which he should have paid promptly to the bank.

But this argument overlooks the practical effect of the escrow arrangement as a security device. Whether we call the escrow instruction an "assignment" of the Diners Club account or not, its purpose and effect were to keep the proceeds out of DeSarno's hands and channel them to Blethen to secure payment of DeSarno's debt to Blethen.

Holding Blethen responsible for what he received is consistent with the policy of Civil Code section 3018. Had Blethen filed a notice of his February assignment he would have had protection against the subsequent assignment to the bank. When DeSarno approached the bank for financing in April, the bank was entitled to assume, from the lack of any recorded notice, that its assignment would have priority as against other creditors of its assignor. This expectation was frustrated when the escrow company, on Blethen's behalf, notified Diners Club to pay into the escrow. The escrow arrangement was a form of security which gave another creditor priority in a manner not contemplated by the statute. When the bank advanced money to Howard Manor, it assumed the risk that DeSarno would misappropriate the Diners Club money when it reached him, but the bank had no reason to anticipate that another creditor of DeSarno had arranged to intercept the money before it ever reached DeSarno. Under these circumstances Blethen is unjustly enriched if he received the proceeds of accounts assigned to the bank.

*Costello* v. *Bank of America* (9th Cir. 1957) 246 F.2d 807 does not support Blethen's position here. In *Costello,* the assigned account (which had been unrecorded) had been paid to the assignee more than four months prior to bankruptcy. The court held that the trustee in bankruptcy could not recover the proceeds from the assignee because on the date as of which the trustee's standing accrued, there was no account receivable, it having been paid. The analogy which Blethen tries to draw here from the *Costello* case fails because Blethen had not yet collected the accounts assigned to him before the bank's rights accrued.

## (2)

We now turn to the evidence relied upon to establish that the money paid by Diners Club into the escrow was in fact money owing by Diners on the accounts which Howard Manor, Inc. had assigned to the bank.

No records belonging to DeSarno or Howard Manor or the Diners Club were offered. The bank relied upon its own records, the testimony of its officer and the records of the escrow to establish circumstantially that Blethen received payment for accounts which had been assigned to the bank.

The bank also produced two accounts receivable "aging" lists which had been furnished by DeSarno. These lists showed, opposite the name of each debtor, the total indebtedness and, in parallel vertical columns, the amount which had accrued in the current month, in each of the three immediately preceding months, and "prior."

One such schedule was dated April 30, 1962, and one was dated March 21, 1962. The bank's officer testified the earlier one was required before the bank would enter into the April 5 agreement. The April 30 list was requested by the bank "by virtue of slow pay." The March 21 list contains no Diners Club account. The April 30 list shows opposite "Diners Club" in the "Total" column the figure $5,835.43. The other columns, which should show the month in which the receivable accrued, contain no entry for this account. (The assignment schedules show three assignments of Diners Club accounts totaling $5,840.70 during April 1962.)

The bank's vice president, Herron, testified that shortly after July 13, 1962, he went to Palm Springs and asked DeSarno, "Sam, what is happening to our funds?" DeSarno answered, " 'Well, I have used them.' "

Herron testified that the assignment schedules in evidence included all of the receivables from the Diners Club on the books of Howard Manor. He reached that conclusion by looking at the ledger cards shown to him at the time of his visit to Howard Manor in July 1962. On cross-examination Herron was asked, "And do you recall how far back you went into the records; that is, how many months back?" Herron answered, "Well, at the inception of our program was where we started to make our review."

Herron further testified that under the bank's arrangement with DeSarno, the latter had been collecting the moneys and forwarding to the bank. From time to time Herron went to Palm Springs and checked the items on the ledger cards "to be sure that they reflected the totals that were assigned." His testimony includes this:

"Q. Now, did you ever determine that you, the Continental Bank, had acquired all of the Diners Club receivables?

"A. There was no way we could have determined this. I mean, if there were a special ledger or entries made some place that I wouldn't know about.

"Q. But with respect to the ledgers that you examined, did it show all the receivables?

"A. Yes."

The record shows absolutely nothing about the arrangements which existed between Howard Manor, Inc. and Diners Club. Although the record does not show it specifically, the parties and the trial court seem to have assumed that Diners Club is an organization which issues credit cards to its members, who purchase services from Howard Manor, who then bills Diners Club, who collects from the members and remits to Howard Manor.

Blethen testified that before he made his February 12, 1962, loan to DeSarno, he examined DeSarno's records to see the prior year's experience, and noted that Diners Club took 60 to 90 days to pay after the charges were forwarded to it. Blethen was an apartment hotel manager in Palm Springs, and was familiar with accounting. (His testimony was received without objection.)

The records of Prudential Escrows show that on May 23, 1962, it received $4,305.75 from Diners Club and on June 27 received $4,185.78 from Diners Club. Both of those amounts were transmitted promptly to Blethen in accordance with the February 12 escrow instruction.

█ In summary, the record shows this: The bank did not receive a blanket assignment of all accounts receivable. It received only specific accounts, as set forth in particular invoices identified only by date of invoice, amount, and name of debtor. The earliest Diners Club account assigned to the bank was the invoice of April 9, 1962. DeSarno had been doing business with Diners Club prior to that time, but the record contains nothing from which to determine that Diners did not owe anything for invoices submitted prior to April 9. It was DeSarno's practice (at least from April 9 to July 13) to invoice Diners Club weekly. There is certainly a basis for an inference that as of April 9, 1962, Diners Club did owe Howard Manor, Inc. substantial sums on invoices submitted during February and March, which were never assigned to the bank.

The trial court could not reasonably base its finding on the fact that DeSarno never showed the bank's officer, Herron, any Diners Club accounts which were outstanding in April, or afterward, except those assigned

to the bank. Herron conceded he had no way of knowing whether DeSarno showed him all of the records, and he learned by hindsight that DeSarno had not been dealing honestly with him.

If the money paid by Diners into escrow was in payment of invoices submitted prior to April 9, Blethen was entitled to it.

The amounts received by Blethen, and the times the payments were made by Diners Club, are not circumstantial evidence supporting the judgment. The invoices for the last three weeks in April came to $5,800. The $8,500 which Blethen received could easily have been derived from invoices submitted between February 12 and April 4. If there was a delay of 60 to 90 days normally between invoice and payment, the second payment sent to Blethen on June 27 could be a normal remittance for a March invoice.

We point out the possible inferences in detail not to suggest which, if any of them, has validity, but to demonstrate that none of them supports a finding that the payments received by Blethen were in fact applicable to accounts which had been assigned to the bank. The bank, as plaintiff, had the burden of proving that Blethen received money belonging to it, and the record simply lacks any support for such a finding.

### (3)

■ If on a retrial, the court should determine, upon substantial evidence, that Blethen collected the accounts which had been assigned to the bank, the bank will be entitled to interest between the date of collection and the date of judgment.

Civil Code section 3287 provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."

This case readily falls within that section. If in fact Blethen collected accounts belonging to the bank, there can be no uncertainty either as to the amount of the damages or the day when payment to the bank became due.

Blethen bases an argument on the statement found in the cases that where the person liable does not know what sum he owes, the damages are uncertain until fixed by the court, and thus there is no basis for the award of prejudgment interest. This statement is sometimes made as an explanation for denying interest where a party is suing for the value of goods and services, where the amount payable is arrived at only by judicial determination, often on conflicting evidence. (See, e.g., *Cox* v. *McLaughlin*

(1881) 76 Cal. 60, 67 [18 P. 100]; *Lineman* v. *Schmid* (1948) 32 Cal.2d 204, 211 [195 P.2d 408, 4 A.L.R.2d 1380]; *Conderback, Inc.* v. *Standard Oil Co.* (1966) 239 Cal.App.2d 664, 689 [48 Cal.Rptr. 901].)

But the fact that the obligor denies any liability at all does not make the damages uncertain within the meaning of section 3287. (*Chase* v. *National Indem. Co.* (1954) 129 Cal.App.2d 853, 865 [278 P.2d 68]; *Sohrokoff* v. *Zumwalt* (1932) 122 Cal.App. 768, 773 [10 P.2d 511].) Thus if the bank establishes that it was entitled to the money which Blethen collected, it will also be entitled to interest from the date Blethen received it.

The judgment is reversed.

Jefferson, J., and Dunn, J., concurred.